VILLAGE OF SCHAUMBURG *v.* CITIZENS FOR A
BETTER ENVIRONMENT ET AL.

No. 78–1335.   Argued October 30, 1979—Decided February 20, 1980

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, STEWART, MARSHALL, BLACKMUN, POWELL, and STEVENS, JJ., joined. REHNQUIST, J., filed a dissenting opinion, *post*, p. 639.

*Jack M. Siegel* argued the cause and filed briefs for petitioner.

*Milton I. Shadur* argued the cause for respondents. With him on the brief were *Geraldine Soat Brown* and *David Goldberger.*

*Adam Yarmolinsky* argued the cause and filed a brief for the Coalition of National Voluntary Organizations et al. as *amici curiae* urging affirmance.*

---

*Briefs of *amici curiae* urging affirmance were filed by *J. Albert Woll* and *Laurence Gold* for the American Federation of Labor and Congress of

MR. JUSTICE WHITE delivered the opinion of the Court.

The issue in this case is the validity under the First and Fourteenth Amendments of a municipal ordinance prohibiting the solicitation of contributions by charitable organizations that do not use at least 75 percent of their receipts for "charitable purposes," those purposes being defined to exclude solicitation expenses, salaries, overhead, and other administrative expenses. The Court of Appeals held the ordinance unconstitutional. We affirm that judgment.

## I

The Village of Schaumburg (Village) is a suburban community located 25 miles northwest of Chicago, Ill. On March 12, 1974, the Village adopted "An Ordinance Regulating Soliciting by Charitable Organizations," codified as Art. III of Chapter 22 of the Schaumburg Village Code (Code), which regulates the activities of "peddlers and solicitors," Code § 22–1 *et seq.* (1975).[1]  Article III[2] provides that

Industrial Organizations; by *Barry A. Fisher* for the Holy Spirit Association for the Unification of World Christianity; by *Arnold H. Gold* for the Los Angeles Council of National Voluntary Health Agencies; by *Alan B. Morrison* for the National Committee for Responsive Philanthropy et al.; and by *Sanford Jay Rosen* for the National Council of Churches of Christ in the U. S. A. et al.

[1] Article II of Chapter 22 regulates commercial solicitation by requiring "for profit peddlers and solicitors" to obtain a commercial license. For the purposes of Art. II, peddlers and solicitors are defined as any persons who, going from place to place without appointment, offer goods or services for sale or take orders for future delivery of goods or services. Code § 22–6.  Section 22–7 requires any person "engage[d] in the business of a peddler or solicitor within the village" to obtain a license. Licenses can be obtained by application to the village collector and payment of an annual fee ranging from $10 to $25. License applications must contain a variety of information, including the kind of merchandise to be offered, the address of the applicant, the name of the applicant's employer, and whether the applicant has ever been arrested for a misdemeanor or felony.

"[e]very charitable organization, which solicits or intends to solicit contributions from persons in the village by door-to-door solicitation or the use of public streets and public ways, shall prior to such solicitation apply for a permit." § 22–20.[3]

§ 22–8. A license must be denied to anyone "who is not found to be a person of good character and reputation." § 22–9.

Solicitation is permitted between the hours of 9 a. m. and 6 p. m., Monday through Saturday. § 22–13. Cheating, deception, or fraudulent misrepresentation by peddlers or solicitors is prohibited by § 22–12. Peddlers and solicitors are required to depart "immediately and peacefully" from the premises of any home displaying a sign, "No Solicitors or Peddlers Invited," near the main entrance. §§ 22–15 and 22–16.

Persons violating the provisions of Art. II may be fined up to $500 for each offense. § 22–18. The village manager may revoke the license of any peddler or solicitor who violates any village ordinance or any state or federal law or who ceases to possess good character. § 22–11.

[2] Article III of Chapter 22 includes §§ 22–19 to 22–24 of the Code. Section 22–19 defines a "charitable organization" as "[a]ny benevolent, philanthropic, patriotic, not-for-profit, or eleemosynary group, association or corporation, or such organization purporting to be such, which solicits and collects funds for charitable purposes." A "charitable purpose" is defined as "[a]ny charitable, benevolent, philanthropic, patriotic, or eleemosynary purpose." A "contribution" is defined as "[t]he promise or grant of any money or property of any kind or value, including payments for literature in excess of the fair market value of said literature."

[3] Applications for charitable solicitation permits must include the following information: the names and addresses of the persons and organizations involved, the dates and times solicitation is to be undertaken, the geographic area in which solicitation will occur, and proof that the organization has complied with state laws governing charitable solicitation and is tax exempt under the Internal Revenue Code. The information contained in permit applications must be verified under oath by a responsible officer of the organization desiring to solicit funds. Completed applications, which must be accompanied by payment of a $10 fee, are submitted by the village clerk to the village board. "If the village board shall find and determine that all requirements of [Article III] have been met, a permit shall be issued specifying the dates and times at which solicitation may take place." § 22–21.

Charitable solicitation permits may permit solicitation only between the hours of 9 a. m. and 6 p. m., Monday through Saturday. No person who has been convicted of a felony or is under indictment for a felony may be

Solicitation of contributions for charitable organizations without a permit is prohibited and is punishable by a fine of up to $500 for each offense. Schaumburg Ordinance No. 1052, §§ 1, 8 (1974).

Section 22–20 (g), which is the focus of the constitutional challenge involved in this case, requires that permit applications, among other things, contain "[s]atisfactory proof that at least seventy-five per cent of the proceeds of such solicitations will be used directly for the charitable purpose of the organization." [4] In determining whether an organization satisfies the 75-percent requirement, the ordinance provides that

"the following items shall not be deemed to be used for the charitable purposes of the organization, to wit:

"(1) Salaries or commissions paid to solicitors;

"(2) Administrative expenses of the organization, including, but not limited to, salaries, attorneys' fees, rents, telephone, advertising expenses, contributions to other organizations and persons, except as a charitable contribution and related expenses incurred as administrative or overhead items." § 22–20 (g).

Respondent Citizens for a Better Environment (CBE) is an Illinois not-for-profit corporation organized for the purpose of promoting "the protection of the environment." CBE is registered with the Illinois Attorney General's Charitable Trust Division pursuant to Illinois law,[5] and has been afforded

used as a solicitor. § 22–23. Section 22–24 provides that "[n]othing herein provided shall permit a solicitor to go upon any premises which has posted a sign indicating 'no solictors or peddlers invited.' "

[4] The "satisfactory proof" of compliance with the 75-percent requirement must include "a certified audit of the last full year of operations, indicating the distribution of funds collected by the organization, or such other comparable evidence as may demonstrate the fact that at least seventy-five per cent of the funds collected are utilized directly and solely for the charitable purpose of the organization." § 22–20.

[5] Illinois law requires "[e]very charitable organization . . . which solicits or intends to solicit contributions from persons in th[e] State by any

tax-exempt status by the United States Internal Revenue Service, and gifts to it are deductible for federal income tax purposes. CBE requested permission to solicit contributions in the Village, but the Village denied CBE a permit because CBE could not demonstrate that 75 percent of its receipts would be used for "charitable purposes" as required by § 22–20 (g) of the Code. CBE then sued the Village in the United States District Court for the Northern District of Illinois, charging that the 75-percent requirement of § 22–20 (g) violated the First and Fourteenth Amendments. Declaratory and injunctive relief was sought.

In its amended complaint, CBE alleged that "[i]t was organized for the purpose, among others, of protecting, maintaining, and enhancing the quality of the Illinois environment." The complaint also alleged:

> "That incident to its purpose, CBE employs 'canvassers' who are engaged in door-to-door activity in the Chicago metropolitan area, endeavoring to distribute literature on environmental topics and answer questions of an environmental nature when posed; solicit contributions to financially support the organization and its programs; receive grievances and complaints of an environmental nature regarding which CBE may afford assistance in the evaluation and redress of these grievances and complaints."

The Village's answer to the complaint averred that the foregoing allegations, even if true, would not be material to

means whatsoever" to file a registration statement with the Illinois Attorney General. Ill. Rev. Stat., ch. 23, § 5102 (a) (1977). The registration statement must include a variety of information about the organization and its fundraising activities.

Charitable organizations are required to "maintain accurate and detailed books and records" which "shall be open to inspection at all reasonable times by the Attorney General or his duly authorized representative." § 5102 (f). Registration statements filed with the Attorney General are also open to public inspection.

the issues of the case, acknowledged that CBE employed "canvassers" to solicit funds, but alleged that "CBE is primarily devoted to raising funds for the benefit and salary of its employees and that its charitable purposes are negligible as compared with the primary objective of raising funds." The Village also alleged "that more than 60% of the funds collected [by CBE] have been spent for benefits of employees and not for any charitable purposes." [6]

CBE moved for summary judgment and filed affidavits describing its purposes and the activities of its "canvassers" as outlined in the complaint. One of the affidavits also alleged that "the door-to-door canvass is the single most important source of funds" for CBE. A second affidavit offered by CBE stated that in 1975 the organization spent 23.3% of its income on fundraising and 21.5% of its income on administration, and that in 1976 these figures were 23.3% and 16.5%, respectively. The Village opposed the motion but filed no counteraffidavits taking issue with the factual representations in CBE's affidavits.

The District Court awarded summary judgment to CBE. The court recognized that although "the government may regulate solicitation in order to protect the community from

---

[6] The Village appended to its answer a copy of an article appearing in a local newspaper. "Is $$ Real Cause in Clean-Air Fight?" Suburban Trib, Nov. 10, 1976, p. 1. Based on reports on file with the Illinois Attorney General's office, the article stated that more than two-thirds of the funds collected by CBE in fiscal year 1975 were spent on salaries and employee health benefits. The article noted that in 1971 the Illinois Attorney General had sued CBE for failing to register its solicitors and for making false claims that CBE was working to " 'increase the size of the attorney general's staff and consequently their effectiveness in the fight against pollution.' " The suit was settled by a consent decree with CBE agreeing to register its solicitors and to change some of the claims it was making. The article stated that the chief of the Charitable Trusts and Solicitation Division of the Illinois Attorney General's office was convinced of CBE's commitment to environmental issues, but that his division would continue to monitor carefully the group's solicitation activities.

fraud, . . . [a]ny action impinging upon the freedom of expression and discussion . . . must be minimal, and intimately related to an articulated, substantial government interest." The court concluded that the 75-percent requirement of § 22–20 (g) of the Code on its face was "a form of censorship" prohibited by the First and Fourteenth Amendments. Section 22–20 (g) was declared void on its face, its enforcement was enjoined, and the Village was ordered to issue a charitable solicitation permit to CBE.

The Court of Appeals for the Seventh Circuit affirmed. 590 F. 2d 220 (1978). The court rejected the Village's argument that summary judgment was inappropriate because material issues of fact were disputed. Because CBE challenged the facial validity of the village ordinance on First Amendment grounds. the court held that "any issue of fact as to the nature of CBE's particular activities is not material . . . and is therefore not an obstacle to the granting of summary judgment." *Id.*, at 223. Like the District Court, the Court of Appeals recognized that the Village had a legitimate interest in regulating solicitation to protect its residents from fraud and the disruption of privacy, but that such regulation "must be done 'with narrow specificity' " when First Amendment interests are affected. *Id.*, at 223–224. The court concluded that even if the 75-percent requirement might be valid as applied to other types of charitable solicitation, the Village's requirement was unreasonable on its face because it barred solicitation by advocacy-oriented organizations even "where it is made clear that the contributions will be used for reasonable salaries of those who will gather and disseminate information relevant to the organization's purpose." *Id.*, at 226. The court distinguished *National Foundation* v. *Fort Worth*, 415 F. 2d 41 (CA5 1969), cert. denied, 396 U. S. 1040 (1970), which upheld an ordinance authorizing denial of charitable solicitation permits to organizations with excessive solicitation costs, on the ground that although the Fort Worth ordinance deemed unreasonable solicitation costs in excess of

20 percent of gross receipts, it nevertheless permitted organizations that demonstrated the reasonableness of such costs to obtain solicitation permits.

We granted certiorari, 441 U. S. 922 (1979), to review the Court of Appeals' determination that the village ordinance violates the First and Fourteenth Amendments.

## II

It is urged that the ordinance should be sustained because it deals only with solicitation and because any charity is free to propagate its views from door to door in the Village without a permit as long as it refrains from soliciting money. But this represents a far too limited view of our prior cases relevant to canvassing and soliciting by religious and charitable organizations.

In *Schneider* v. *State,* 308 U. S. 147 (1939), a canvasser for a religious society, who passed out booklets from door to door and asked for contributions, was arrested and convicted under an ordinance which prohibited canvassing, soliciting, or distribution of circulars from house to house without a permit, the issuance of which rested much in the discretion of public officials. The state courts construed the ordinance as aimed mainly at house-to-house canvassing and solicitation. This distinguished the case from *Lovell* v. *Griffin,* 303 U. S. 444 (1938), which had invalidated on its face and on First Amendment grounds an ordinance criminalizing the distribution of any handbill at any time or place without a permit. Because the canvasser's conduct "amounted to the solicitation . . . of money contributions without a permit" *Schneider, supra,* at 159, and because the ordinance was thought to be valid as a protection against fraudulent solicitations, the conviction was sustained. This Court disagreed, noting that the ordinance applied not only to religious canvassers but also to "one who wishes to present his views on political, social or economic questions," 308 U. S., at 163, and holding that the city could not, in the name of preventing fraudulent appeals, subject

door-to-door advocacy and the communication of views to the discretionary permit requirement. The Court pointed out that the ordinance was not limited to those "who canvass for private profit," *ibid.*, and reserved the question whether "commercial soliciting and canvassing" could be validly subjected to such controls. *Id.*, at 165.

*Cantwell* v. *Connecticut,* 310 U. S. 296 (1940), involved a state statute forbidding the solicitation of contributions of anything of value by religious, charitable, or philanthropic causes without obtaining official approval. Three members of a religious group were convicted under the statute for selling books, distributing pamphlets, and soliciting contributions or donations. Their convictions were affirmed in the state courts on the ground that they were soliciting funds and that the statute was valid as an attempt to protect the public from fraud. This Court set aside the convictions, holding that although a "general regulation, in the public interest, of solicitation, which does not involve any religious test and does not unreasonably obstruct or delay the collection of funds, is not open to any constitutional objection," *id.*, at 305, to "condition the solicitation of aid for the perpetuation of religious views or systems upon a license, the grant of which rests in the exercise of a determination by state authority as to what is a religious cause," *id.*, at 307, was considered to be an invalid prior restraint on the free exercise of religion. Although *Cantwell* turned on the Free Exercise Clause, the Court has subsequently understood *Cantwell* to have implied that soliciting funds involves interests protected by the First Amendment's guarantee of freedom of speech. *Virginia Pharmacy Board* v. *Virginia Citizens Consumer Council,* 425 U. S. 748, 761 (1976); *Bates* v. *State Bar of Arizona,* 433 U. S. 350, 363 (1977).

In *Valentine* v. *Chrestensen,* 316 U. S. 52 (1942), an arrest was made for distributing on the public streets a commercial advertisement in violation of an ordinance forbidding this distribution. Addressing the question left open in *Schneider,*

the Court recognized that while municipalities may not unduly restrict the right of communicating information in the public streets, the "Constitution imposes no such restraint on government as respects purely commercial advertising." 316 U. S., at 54. The Court reasoned that unlike speech "communicating information and disseminating opinion" commercial advertising implicated only the solicitor's interest in pursuing "a gainful occupation." *Ibid.*

The following Term in *Jamison* v. *Texas,* 318 U. S. 413 (1943), the Court, without dissent, and with the agreement of the author of the *Chrestensen* opinion, held that although purely commercial leaflets could be banned from the streets, a State could not "prohibit the distribution of handbills in the pursuit of a clearly religious activity merely because the handbills invite the purchase of books for the improved understanding of the religion or because the handbills seek in a lawful fashion to promote the raising of funds for religious purposes." 318 U. S., at 417. The Court reaffirmed what it deemed to be an identical holding in *Schneider,* as well as the ruling in *Cantwell* that "a state might not prevent the collection of funds for a religious purpose by unreasonably obstructing or delaying their collection." 318 U. S., at 417. See also, *Largent* v. *Texas,* 318 U. S. 418 (1943).

In the course of striking down a tax on the sale of religious literature, the majority opinion in *Murdock* v. *Pennsylvania,* 319 U. S. 105 (1943), reiterated the holding in *Jamison* that the distribution of handbills was not transformed into an unprotected commercial activity by the solicitation of funds. Recognizing that drawing the line between purely commercial ventures and protected distributions of written material was a difficult task, the Court went on to hold that the sale of religious literature by itinerant evangelists in the course of spreading their doctrine was not a commercial enterprise beyond the protection of the First Amendment.

On the same day, the Court invalidated a municipal ordinance that forbade the door-to-door distribution of handbills,

circulars, or other advertisements. None of the justifications for the general prohibition was deemed sufficient; the right of the individual resident to warn off such solicitors was deemed sufficient protection for the privacy of the citizen. *Martin* v. *Struthers,* 319 U. S. 141 (1943). On its facts, the case did not involve the solicitation of funds or the sale of literature.

*Thomas* v. *Collins,* 323 U. S. 516 (1945), held that the First Amendment barred enforcement of a state statute requiring a permit before soliciting membership in any labor organization. Solicitation and speech were deemed to be so intertwined that a prior permit could not be required. The Court also recognized that "espousal of the cause of labor is entitled to no higher constitutional protection than the espousal of any other lawful cause." *Id.,* at 538. The Court rejected the notion that First Amendment claims could be dismissed merely by urging "that an organization for which the rights of free speech and free assembly are claimed is one 'engaged in business activities' or that the individual who leads it in exercising these rights receives compensation for doing so." *Id.,* at 531. Concededly, the "collection of funds" might be subject to reasonable regulation, but the Court ruled that such regulation "must be done, and the restriction applied, in such a manner as not to intrude upon the rights of free speech and free assembly." *Id.,* at 540–541.

In 1951, *Breard* v. *Alexandria,* 341 U. S. 622, was decided. That case involved an ordinance making it criminal to enter premises without an invitation to sell goods, wares, and merchandise. The ordinance was sustained as applied to door-to-door solicitation of magazine subscriptions. The Court held that the sale of literature introduced "a commercial feature," *id.,* at 642, and that the householder's interest in privacy outweighed any rights of the publisher to distribute magazines by uninvited entry on private property. The Court's opinion, however, did not indicate that the solicitation of gifts or contributions by religious or charitable organizations should be deemed commercial activities, nor did the facts of

*Breard* involve the sale of religious literature or similar materials. *Martin* v. *Struthers, supra,* was distinguished but not overruled.

*Hynes* v. *Mayor of Oradell,* 425 U. S. 610 (1976), dealt with a city ordinance requiring an identification permit for canvassing or soliciting from house to house for charitable or political purposes. Based on its review of prior cases, the Court held that soliciting and canvassing from door to door were subject to reasonable regulation so as to protect the citizen against crime and undue annoyance, but that the First Amendment required such controls to be drawn with " 'narrow specificity.' " *Id.,* at 620. The ordinance was invalidated as unacceptably vague.

Prior authorities, therefore, clearly establish that charitable appeals for funds, on the street or door to door, involve a variety of speech interests—communication of information, the dissemination and propagation of views and ideas, and the advocacy of causes—that are within the protection of the First Amendment. Soliciting financial support is undoubtedly subject to reasonable regulation but the latter must be undertaken with due regard for the reality that solicitation is characteristically intertwined with informative and perhaps persuasive speech seeking support for particular causes or for particular views on economic, political, or social issues, and for the reality that without solicitation the flow of such information and advocacy would likely cease. Canvassers in such contexts are necessarily more than solicitors for money. Furthermore, because charitable solicitation does more than inform private economic decisions and is not primarily concerned with providing information about the characteristics and costs of goods and services, it has not been dealt with in our cases as a variety of purely commercial speech.[7]

---

[7] To the extent that any of the Court's past decisions discussed in Part II hold or indicate that commercial speech is excluded from First Amendment protections, those decisions, to that extent, are no longer good law. *Virginia Pharmacy Board* v. *Virginia Citizens Consumer Council,* 425

## III

The issue before us, then, is not whether charitable solicitations in residential neighborhoods are within the protections of the First Amendment. It is clear that they are. "[O]ur cases long have protected speech even though it is in the form of . . . a solicitation to pay or contribute money, *New York Times Co.* v. *Sullivan,* [376 U. S. 254 (1964)]." *Bates* v. *State Bar of Arizona,* 433 U. S., at 363.

The issue is whether the Village has exercised its power to regulate solicitation in such a manner as not unduly to intrude upon the rights of free speech. *Hynes* v. *Mayor of Oradell, supra,* at 616. In pursuing this question we must first deal with the claim of the Village that summary judgment was improper because there was an unresolved factual dispute concerning the true character of CBE's organization. Although CBE's affidavits in support of its motion for summary judgment and describing its interests, the activities of its canvassers, and the percentage of its receipts devoted to salaries and administrative expenses were not controverted, the District Court made no findings with respect to the nature of CBE's activities; and the Court of Appeals expressly stated that the facts with respect to the internal affairs and operations of the organization were immaterial to a proper resolution of the case. The Village claims, however, that it should have had a chance to prove that the 75-percent requirement is valid as applied to CBE because CBE spends so much of its resources for the benefit of its employees that it may appropriately be deemed an organization existing for private profit rather than for charitable purposes.

We agree with the Court of Appeals that CBE was en-

---

U. S. 748, 758–759, 762 (1976). For the purposes of applying the overbreadth doctrine, however, see *infra,* at 634, it remains relevant to distinguish between commercial and noncommercial speech. *Bates* v. *State Bar of Arizona,* 433 U. S. 350, 381 (1977).

titled to its judgment of facial invalidity if the ordinance purported to prohibit canvassing by a substantial category of charities to which the 75-percent limitation could not be applied consistently with the First and Fourteenth Amendments, even if there was no demonstration that CBE itself was one of these organizations.[8]  Given a case or controversy, a litigant whose own activities are unprotected may nevertheless challenge a statute by showing that it substantially abridges the First Amendment rights of other parties not before the court.  *Grayned* v. *City of Rockford,* 408 U. S. 104, 114–121 (1972); *Chaplinsky* v. *New Hampshire,* 315 U. S. 568 (1942); *Schneider* v. *State,* 308 U. S., at 162–165; *Lovell* v. *Griffin,* 303 U. S., at 451; *Thornhill* v. *Alabama,* 310 U. S. 88, 97 (1940).  See also the discussion in *Broadrick* v. *Oklahoma,* 413 U. S. 601, 612–616 (1973), and in *Bigelow* v. *Virginia,* 421 U. S. 809, 815–817 (1975).  In these First Amendment contexts, the courts are inclined to disregard the normal rule against permitting one whose conduct may validly be prohibited to challenge the proscription as it applies to others because of the possibility that protected speech or associative activities may be inhibited by the overly broad reach of the statute.

We have declared the overbreadth doctrine to be inapplicable in certain commercial speech cases, *Bates* v. *State Bar of Arizona, supra,* at 381, but as we have indicated, that limitation does not concern us here.  The Court of Appeals was thus free to inquire whether § 22–20 (g) was overbroad, a question of law that involved no dispute about the characteristics of CBE.  On this basis, proceeding to rule on the merits of

---

[8] CBE defends the rationale of the Court of Appeals, but it also asserts that the facts concerning its purposes and its operations were uncontroverted and are sufficiently complete to demonstrate that the 75-percent limitation is invalid as applied to it.  As a respondent, CBE is entitled to urge its position although the Court of Appeals did not reach it; but we need not pursue it since we do not conclude that the Court of Appeals was in error.

the summary judgment was proper. As we have indicated, we also agree with the Court of Appeals' ruling on the motion.

## IV

Although indicating that the 75-percent limitation might be enforceable against the more "traditional charitable organizations" or "where solicitors represent themselves as mere conduits for contributions," 590 F. 2d, at 225, 226, the Court of Appeals identified a class of charitable organizations as to which the 75-percent rule could not constitutionally be applied. These were the organizations whose primary purpose is not to provide money or services for the poor, the needy or other worthy objects of charity, but to gather and disseminate information about and advocate positions on matters of public concern. These organizations characteristically use paid solicitors who "necessarily combine" the solicitation of financial support with the "functions of information dissemination, discussion, and advocacy of public issues." *Id.,* at 225. These organizations also pay other employees to obtain and process the necessary information and to arrive at and announce in suitable form the organizations' preferred positions on the issues of interest to them. Organizations of this kind, although they might pay only reasonable salaries, would necessarily spend more than 25 percent of their budgets on salaries and administrative expenses and would be completely barred from solicitation in the Village.[9] The Court of Appeals

---

[9] The village ordinance requires all charitable organizations that seek "to solicit contributions from persons in the village by door-to-door solicitation or the use of public streets and public ways" to obtain a charitable solicitation permit. Code § 22–20. Solicitation without a permit is prohibited. Schaumburg Ordinance No. 1052, § 1 (1974). Unlike the ordinance upheld in *National Foundation* v. *Fort Worth,* 415 F. 2d 41 (CA5 1969), cert. denied, 396 U. S. 1040 (1970), the village ordinance has no provision permitting an organization unable to comply with the 75-percent requirement to obtain a permit by demonstrating that its solicitation costs are nevertheless reasonable. Moreover, because compliance with the 75-percent requirement depends on organizations' receipts and expenses dur-

concluded that such a prohibition was an unjustified infringement of the First and Fourteenth Amendments.

We agree with the Court of Appeals that the 75-percent limitation is a direct and substantial limitation on protected activity that cannot be sustained unless it serves a sufficiently strong, subordinating interest that the Village is entitled to protect. We also agree that the Village's proffered justifications are inadequate and that the ordinance cannot survive scrutiny under the First Amendment.

The Village urges that the 75-percent requirement is intimately related to substantial governmental interests "in protecting the public from fraud, crime and undue annoyance." These interests are indeed substantial, but they are only peripherally promoted by the 75-percent requirement and could be sufficiently served by measures less destructive of First Amendment interests.

Prevention of fraud is the Village's principal justification for prohibiting solicitation by charities that spend more than one-quarter of their receipts on salaries and administrative expenses. The submission is that any organization using more than 25 percent of its receipts on fundraising, salaries, and overhead is not a charitable, but a commercial, for-profit enterprise and that to permit it to represent itself as a charity is fraudulent. But, as the Court of Appeals recognized, this cannot be true of those organizations that are primarily engaged in research, advocacy, or public education and that use their own paid staff to carry out these functions as well as

---

ing the previous year, there appears to be no way an organization can alter its spending patterns to comply with the ordinance in the short run. Thus, the village ordinance effectively bars all in-person solicitation by organizations who spent more than one-quarter of their receipts in the previous year on salaries and administrative expenses.

Although there is some suggestion that organizations unable to comply with the 75-percent requirement may be able to obtain commercial solicitation permits, the ordinance governing issuance of such permits appears to apply only to solicitors offering goods or services for sale. Code § 22–6.

to solicit financial support. The Village, consistently with the First Amendment, may not label such groups "fraudulent" and bar them from canvassing on the streets and house to house.[10] Nor may the Village lump such organizations with those that in fact are using the charitable label as a cloak for profitmaking and refuse to employ more precise measures to separate one kind from the other. The Village may serve its legitimate interests, but it must do so by narrowly drawn regulations designed to serve those interests without unnecessarily interfering with First Amendment freedoms. *Hynes* v. *Mayor of Oradell*, 425 U. S., at 620; *First National Bank of Boston* v. *Bellotti*, 435 U. S. 765, 786 (1978). "Broad prophylactic rules in the area of free expression are suspect. Precision of regulation must be the touchstone. . . ." *NAACP* v. *Button*, 371 U. S. 415, 438 (1963) (citations omitted).

The Village's legitimate interest in preventing fraud can be better served by measures less intrusive than a direct prohibition on solicitation. Fraudulent misrepresentations can be prohibited and the penal laws used to punish such conduct directly. *Schneider* v. *State*, 308 U. S., at 164; *Cantwell* v. *Connecticut*. 310 U. S., at 3^6; *Virginia Pharmacy Board* v. *Virginia Citizens Consumer Council*, 425 U. S., at 771.[11] Ef-

---

[10] There is no dispute that organizations of the kind described in CBE's affidavits are considered to be nonprofit, charitable organizations under both federal and state law, despite the fact that they devote more than one-quarter of their receipts to salaries and administrative expenses. The costs incurred by charitable organizations conducting fundraising campaigns can vary dramatically depending upon a wide range of variables, many of which are beyond the control of the organization.

[11] The Village Code, for example, already contains direct proscriptions of fraud by commercial solicitors. Section 22–12 makes it "unlawful for any peddler or solicitor to cheat, deceive or fraudulently misrepresent, whether through himself or through an employee, while acting as a peddler or solicitor in the village. . . ." Unlike the situation in *Ohralik* v. *Ohio State Bar Assn.*, 436 U. S. 447 (1978), where we upheld disciplinary action taken against an attorney who solicited accident victims for the purpose of

forts to promote disclosure of the finances of charitable organizations also may assist in preventing fraud by informing the public of the ways in which their contributions will be employed.[12] Such measures may help make contribution decisions more informed, while leaving to individual choice the decision whether to contribute to organizations that spend large amounts on salaries and administrative expenses.

We also fail to perceive any substantial relationship between the 75-percent requirement and the protection of public safety or of residential privacy. There is no indication that organizations devoting more than one-quarter of their funds to salaries and administrative expenses are any more likely to employ solicitors who would be a threat to public safety than are other charitable organizations.[13] Other provisions in the ordinance that are not challenged here, such as the provision making it unlawful for charitable organizations to use convicted felons as solicitors, Code § 22–23, may bear some relation to public safety; the 75-percent requirement does not.

The 75-percent requirement is related to the protection of privacy only in the most indirect of ways. As the Village concedes, householders are equally disturbed by solicitation on behalf of organizations satisfying the 75-percent requirement as they are by solicitation on behalf of other organizations. The 75-percent requirement protects privacy only by reducing the total number of solicitors, as would any prohibition on solicitation. The ordinance is not directed to the unique privacy interests of persons residing in their homes

---

obtaining remunerative employment, charitable solicitation is not so inherently conducive to fraud and overreaching as to justify its prohibition.

[12] Illinois law, for example, requires charitable organizations to register with the State Attorney General's Office and to report certain information about their structure and fundraising activities. Ill. Rev. Stat., ch. 23, § 5102 (a) (1977). See n. 5, *supra*.

[13] Indeed, solicitation by organizations employing paid solicitors carefully screened in advance may be even less of a threat to public safety than solicitation by organizations using volunteers.

because it applies not only to door-to-door solicitation, but also to solicitation on "public streets and public ways." § 22–20. Other provisions of the ordinance, which are not challenged here, such as the provision permitting homeowners to bar solicitors from their property by posting signs reading "No Solicitors or Peddlers Invited," § 22–24, suggest the availability of less intrusive and more effective measures to protect privacy. See *Rowan* v. *Post Office Dept.*, 397 U. S. 728 (1970); *Martin* v. *Struthers*, 319 U. S., at 148.

The 75-percent requirement in the village ordinance plainly is insufficiently related to the governmental interests asserted in its support to justify its interference with protected speech. "Frauds may be denounced as offenses and punished by law. Trespasses may similarly be forbidden. If it is said that these means are less efficient and convenient than . . . [deciding in advance] what information may be disseminated from house to house, and who may impart the information, the answer is that considerations of this sort do not empower a municipality to abridge freedom of speech and press." *Schneider* v. *State*, *supra*, at 164.

We find no reason to disagree with the Court of Appeals' conclusion that § 22–20 (g) is unconstitutionally overbroad. Its judgment is therefore affirmed.

*It is so ordered.*

MR. JUSTICE REHNQUIST, dissenting.

The Court holds that Art. III of the Schaumburg Village Code is unconstitutional as applied to prohibit respondent Citizens for a Better Environment (CBE) from soliciting contributions door to door. If read in isolation, today's decision might be defensible. When combined with this Court's earlier pronouncements on the subject, however, today's decision relegates any local government interested in regulating door-to-door activities to the role of Sisyphus.

The Court's opinion first recites the litany of language from 40 years of decisions in which this Court has considered various

restrictions on the right to distribute information or solicit door to door, concluding from these decisions that "charitable appeals for funds, on the street or door to door, involve a variety of speech interests . . . that are within the protection of the First Amendment." *Ante,* at 632. I would have thought this proposition self-evident now that this Court has swept even the most banal commercial speech within the ambit of the First Amendment. See *Virginia Pharmacy Board* v. *Virginia Citizens Consumer Council,* 425 U. S. 748 (1976). But, having arrived at this conclusion on the basis of earlier cases, the Court effectively departs from the reasoning of those cases in discussing the limits on Schaumburg's authority to place limitations on so-called "charitable" solicitors who go from house to house in the village.

The Court's neglect of its prior precedents in this regard is entirely understandable, since the earlier decisions striking down various regulations covering door-to-door activities turned upon factors not present in the instant case. A plurality of these decisions turned primarily, if not exclusively, upon the amount of discretion vested in municipal authorities to grant or deny permits on the basis of vague or even non-existent criteria. See *Schneider* v. *State,* 308 U. S. 147, 163–164 (1939); *Cantwell* v. *Connecticut,* 310 U. S. 296, 305–306 (1940); *Largent* v. *Texas,* 318 U. S. 418, 422 (1943); *Hynes* v. *Mayor of Oradell,* 425 U. S. 610, 620–621 (1976). In *Schneider,* for example, the Court invalidated such an ordinance as applied to Jehovah's Witnesses because "in the end, [the applicant's] liberty to communicate with the residents of the town at their homes depends upon the exercise of the officer's discretion." 308 U. S., at 164. These cases clearly do not control the validity of Schaumburg's ordinance, which leaves virtually no discretion in the hands of the licensing authority.

Another line of earlier cases involved the distribution of information, as opposed to requests for contributions. *Martin* v. *Struthers,* 319 U. S. 141 (1943), for example, dealt with

Jehovah's Witnesses who had gone door to door with invitations to a religious meeting despite a local ordinance prohibiting distribution of any "handbills, circulars or other advertisements" door to door. The Court noted that such an ordinance "limits the dissemination of knowledge," and that it could "serve no purpose but that forbidden by the Constitution, the naked restriction of the dissemination of ideas." *Id.,* at 144, 147.

Here, however, the challenged ordinance deals not with the dissemination of ideas, but rather with the solicitation of money. That the *Martin* Court would have found this distinction important is apparent not only from *Martin's* emphasis on the dissemination of knowledge, but also from various other decisions of the same period. In *Breard* v. *Alexandria,* 341 U. S. 622 (1951), for example, the Court upheld an ordinance prohibiting "solicitors, peddlers, hawkers, itinerant merchants, or transient vendors of merchandise" from entering private property without permission. The petitioner in *Breard* had been going door to door soliciting subscriptions for magazines. Despite petitioner's invocation of both freedom of speech and freedom of the press, the Court distinguished the "commercial feature" of the transactions from their informational overtone. See *id.,* at 642. Because *Martin* "was narrowly limited to the precise fact of the free distribution of an invitation to religious services," the Court found that it was "not necessarily inconsistent with the conclusion reached in this case." 341 U. S., at 643.

Shunning the guidance of these cases, the Court sets out to define a new category of solicitors who may not be subjected to regulation. According to the Court, Schaumburg cannot prohibit door-to-door solicitation for contributions by "organizations whose primary purpose is . . . to gather and disseminate information about and advocate positions on matters of public concern." *Ante,* at 635. In another portion of its opinion, the majority redefines this immunity as extending to all

organizations "primarily engaged in research, advocacy, or public education and that use their own paid staff to carry out these functions as well as to solicit financial support." *Ante,* at 636–637. This result—or perhaps, more accurately, these results—seem unwarranted by the First and Fourteenth Amendments for three reasons.

First, from a legal standpoint, the Court invites municipalities to draw a line it has already erased. Today's opinion strongly, and I believe correctly, implies that the result here would be otherwise if CBE's primary objective were to provide "information about the characteristics and costs of goods and services," *ante,* at 632, rather than to "advocate positions on matters of public concern." *Ante,* at 635. Four years ago, however, the Court relied upon the supposed bankruptcy of this very distinction in overturning a prohibition on advertising by pharmacists. See *Virginia Pharmacy Board* v. *Virginia Citizens Consumer Council, supra.* According to *Virginia Pharmacy,* while "not all commercial messages contain the same or even a very great public interest element[,] [t]here are few to which such an element . . . could not be added." 425 U. S., at 764. This and other considerations led the Court in that case to conclude that "no line between publicly 'interesting' or 'important' commercial advertising and the opposite kind could ever be drawn." *Id.,* at 765. To the extent that the Court found such a line elusive in *Virginia Pharmacy,* I venture to suggest that the Court, as well as local legislators, will find the line equally elusive in the context of door-to-door solicitation.

Second, from a practical standpoint, the Court gives absolutely no guidance as to how a municipality might identify those organizations "whose primary purpose is . . . to gather and disseminate information about and advocate positions on matters of public concern," and which are therefore exempt from Art. III. Earlier cases do provide one guideline: the municipality must rely on objective criteria, since reliance

upon official discretion in any significant degree would clearly run afoul of *Schneider, Cantwell, Largent,* and *Hynes.*[1] In requiring municipal authorities to use "more precise measures to separate" constitutionally preferred organizations from their less preferred counterparts, *ante,* at 637, the Court would do well to remember that these local bodies are poorly equipped to investigate and audit the various persons and organizations that will apply to them for preferred status. Stripped of discretion, they must be able to resort to a line-drawing test capable of easy and reliable application without the necessity for an exhaustive case-by-case investigation of each applicant.[2]

---

[1] In this regard, I find somewhat surprising the Court's reference to the ordinance considered in *National Foundation* v. *Fort Worth,* 415 F. 2d 41 (CA5 1969), cert. denied, 396 U. S. 1040 (1970), as if it were an improvement .on Schaumburg's ordinance. See *ante,* at 635, n. 9. Fort Worth requires solicitors to demonstrate that the cost of soliciting will not exceed 20 percent of the amount expected to be raised. The Court finds appeal, however, in the ability of Fort Worth's officials to waive that requirement if the applicant can show that the costs of solicitation are "not unreasonable." See 415 F. 2d, at 44, n. 2. Given the potential for abuse of this open-ended grant of discretion, I would think that Fort Worth's ordinance would be more, not less, suspect than Schaumburg's.

[2] The Court implies that an organization's eligibility for tax-exempt status under state or federal law could determine its eligibility for preferred constitutional status in its fundraising efforts. See *ante,* at 637, n. 10. Such a rule, although superficially appealing, suffers from serious drawbacks. The availability of such exemptions and deductions is a matter of legislative grace, not constitutional privilege. See *Commissioner* v. *Sullivan,* 356 U. S. 27, 28 (1958). See also *Lewyt Corp.* v. *Commissioner,* 349 U. S. 237, 240 (1955). Indeed, prior to the Tax Reform Act of 1976, a federal exemption was not available to any organization that devoted a "substantial part" of its activities to attempts "to influence legislation." See 26 U. S. C. § 501 (c) (3), as amended by Pub. L. 94–455, 90 Stat. 1727. See also 1976 U. S. Code Cong. & Admin. News 2897, 4104–4109. Even today there are strict limitations on the amount a tax-exempt organization can spend on such activities. See 26 U. S. C. § 501 (h). Nevertheless, I imagine that the lobbying activities previously excluded from, and now closely regulated by, § 501 would lie close to the core of those activities that the Court seeks to protect. For this reason, I cannot believe that

Finally, I believe that the Court overestimates the value, in a constitutional sense, of door-to-door solicitation for financial contributions and simultaneously underestimates the reasons why a village board might conclude that regulation of such activity was necessary. In *Hynes* v. *Mayor of Oradell*, this Court referred with approval to Professor Zechariah Chafee's observation that "[o]f all the methods of spreading unpopular ideas, [house-to-house convassing] seems the least entitled to extensive protection." 425 U. S., at 619, quoting Z. Chafee, Free Speech in the United States 406 (1954). While such activity may be worthy of heightened protection when limited to the dissemination of information, see, *e. g., Martin* v. *Struthers,* 319 U. S. 141 (1943), or when designed to propagate religious beliefs, see, *e. g., Cantwell* v. *Connecticut,* 310 U. S. 296 (1940), I believe that a simple request for money lies far from the core protections of the First Amendment as heretofore interpreted. In the case of such solicitation, the community's interest in insuring that the collecting organization meet some objective financial criteria is indisputably valid. Regardless of whether one labels noncharitable solicitation "fraudulent," nothing in the United States Constitution should prevent residents of a community from making the collective judgment that certain worthy charities may solicit door to door while at the same time insulating themselves against panhandlers, profiteers, and peddlers.

The central weakness of the Court's decision, I believe, is its failure to recognize, let alone confront, the two most important issues in this case: how does one define a "charitable" organization, and to which authority in our federal system is application of that definition confided? I would uphold Schaumburg's ordinance as applied to CBE because that ordi-

---

the Court bases CBE's First Amendment protection on such sandy soil. Yet it gives no indication what other objectively verifiable characteristics might render an organization eligible for preferred status under the First Amendment.

nance, while perhaps too strict to suit some tastes, affects only door-to-door solicitation for financial contributions, leaves little or no discretion in the hands of municipal authorities to "censor" unpopular speech, and is rationally related to the community's collective desire to bestow its largess upon organizations that are truly "charitable." I therefore dissent.