620 A.2d 647

**COMMONWEALTH of Pennsylvania by Ernest D. PREATE, Jr., Attorney General, Plaintiff**

**v.**

**CANCER FUND OF AMERICA, INC., Defendant.**

Commonwealth Court of Pennsylvania.

Argued Nov. 19, 1992.

Decided Jan. 27, 1993.

Mark A. Pacella, Deputy Atty. Gen., for plaintiff.

Andrew L. Lipps, for defendant.

Before CRAIG, President Judge, and SMITH, J., and NARICK, Senior Judge.

CRAIG, President Judge.

This case involves preliminary objections filed by the Cancer Fund of America (CFA) to a complaint in equity filed by the Attorney General on behalf of the Commonwealth. Most of CFA's twenty numbered objections are in the nature of a demurrer. The remaining objections challenge the complaint on First Amendment grounds, asserting that the Act upon which the Attorney General bases his complaint, the Solicitation of Funds for Charitable Purposes Act, Act of December 19, 1990, P.L. 1200, *as amended,* 10 P.S. §§ 162.1–162.24, regulates free speech but is not content-neutral, thus implicating the First Amendment.

The relevant facts averred in the complaint are as follows. CFA is registered as a charitable organization with the Commonwealth's Bureau of Charitable Organizations, as required by section 5 of the Act, 10 P.S. § 162.5, and currently solicits charitable contributions from Pennsylvania residents. According to registration materials on file with the bureau, CFA's purpose in 1991 was to assist indigent cancer patients by

providing financial aid, to make grants to hospices for cancer patients, and to disseminate information regarding the detection and prevention of cancer.

In written solicitations CFA distributed in 1991, it distinguished its activities from other charitable cancer organizations by noting that its priority is patient aid rather than research.

A consent judgment that CFA entered in 1991 required it to disclose in its solicitations the percentage of total contributions CFA expended on activities associated with fundraising during the previous fiscal year. Before entering the consent judgment, CFA had a history of expending on patient services less than five percent of contributions received. CFA spent over ninety-five percent of its contributions on fundraising, and on administration and public education associated with fundraising.

The statement CFA filed for 1991, required of CFA to comply with the terms of the consent judgment, indicated that $5,696,022.00 of the $7,401,791.00 CFA reported in patient services was actually gifts-in-kind, or goods and commodities that were donated to CFA, which CFA then donated to others. CFA regarded those donations as a fulfillment of the statement of its charitable purposes. The gifts-in-kind included vegetable seeds, books, medical supplies, high fiber food, baby food and hospice supplies.

Under section 5(f) of the Act, 10 P.S. § 162.5, the financial statements charitable organizations file must be audited by independent accountants. The audits must be performed in accordance with standards adopted by the American Institute of Certified Public Accountants (AICPA). The AICPA's Generally Accepted Accounting Principles (GAAP) provide that gifts-in-kind should be reported at fair market value.

The Commonwealth alleges that CFA used original or current retail value for the donated items, but should have used the fair market value as required by GAAP. Furthermore, the Commonwealth asserts that GAAP requires that, when donated items are merely passed through from the charitable

organization to beneficiaries, the donation normally should not be recorded as a contribution. In this case, more than half of the gifts-in-kind were transferred directly from the donor to the beneficiaries. Also, none of the gifts-in-kind were consistent with CFA's purported purpose. Also, CFA reported nearly one million dollars in contributions as assistance to individuals that it did not actually provide.

### 1. Free Speech Under United States or Pennsylvania Constitutions

CFA argues that the Act is facially unconstitutional under both the United States and Pennsylvania Constitutions. CFA bases this claim on its assertion that § 3 of the Act, 10 P.S. § 162.3 is not content neutral because it exempts certain organizations, including firefighters, veterans organizations and religious groups from application of the Act, and thus favors those exempted charitable groups, which have a different message to convey than CFA. Exempted organizations may freely solicit contributions within the Commonwealth and need not comply with the Act's registration requirements.

The Commonwealth relies upon the United States Supreme Court's decision in *Riley v. National Federation of the Blind of North Carolina, Inc.*, 487 U.S. 781, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988), in which that court stated that states "may vigorously enforce [their] antifraud laws to prohibit professional fundraisers from obtaining money on false pretenses or by making false statements." *Id.* at 800, 108 S.Ct. at 2679.

*Riley* involved a challenge to three provisions of North Carolina's Charitable Solicitation Act. One of the challenged provisions prohibited professional fundraisers from soliciting without an approved license; however, volunteer fundraisers were permitted to solicit immediately upon submitting a license application. The licensing scheme at issue in *Riley* is distinguishable from Pennsylvania's requirements in that all solicitors in the *Riley* case were required to submit license applications. However, the licensing provision at issue in *Riley* could have had the same operational effect upon solici-

tors as the provisions in the present case, by precluding certain solicitors from engaging in fundraising activities, while permitting others to proceed without prior governmental intervention.

The Supreme Court held all three challenged provisions to be unconstitutional. The court concluded that, because a speaker's rights are not lost merely because of the receipt of compensation, and the state's power to license speakers affects their speech, the licensing provision was subject to First Amendment scrutiny. Because the regulation did not require the state to act on a license application within a specific period of time, the state's method of furthering its interest in regulating those who solicit money violated the First Amendment. Specifically, the court stated that the potential for indefinite delay created by the licensing provision unconstitutionally compelled the speaker's silence.

In *Schaumberg v. Citizens for a Better Environment,* 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980) the Supreme Court held unconstitutional a local ordinance that required that charitable solicitors apply 75% of contributions towards charitable purposes. The court used strict First Amendment scrutiny and concluded that other measures, including the existing anti-fraud laws that required charities to file financial disclosure reports, served the state's interests without unduly burdening the speakers' First Amendment rights, as compared with the challenged regulation, which the court concluded only "peripherally promoted" the state's interest. *Schaumberg,* 444 U.S. at 637–638, 100 S.Ct. at 836. Although that decision appears to hold that requirements similar to the Commonwealth's charitable organization solicitation provisions are constitutional, *Schaumberg* is factually dissimilar because it did not involve registration provisions that exempted certain charitable entities.

By favoring exempt organizations, the provision at issue here can be said to have a burdensome affect on charitable organizations that are required to comply with the Act's requirements. Organizations subject to the Act must comply with it or they will not be allowed to engage in fundraising

activities. The entities that are exempted may proceed to engage in such activity without any such prior governmental regulation.

The United States Supreme Court has never held that content-based regulations are per se unconstitutional. "[C]ontent discrimination occurs when the government's purpose concerns the communicative impact of the speech, and not when the government's purpose concerns the noncommunicative impact." Susan H. Williams, *Content Discrimination and the First Amendment*, 139 University of Pennsylvania Law Review 615, 618-9 (1991). Williams describes communicative impact as relating to the function of speech as communication of a specific message to a listener, as compared to noncommunicative impact of speech, which could be something such as increased noise on the street created by the act of communicating a message.

 Regulations are unconstitutionally discriminatory as to content only if the governmental purpose the regulation serves is related to the content of the speech at issue. As Williams notes, neither a content-discriminatory impact on either the speech market or on the speaker in particular, nor a content-based distinction on the face of the regulation renders a regulation unconstitutionally content discriminatory, unless the government's purpose in adopting the regulation is related to the content of the speech.

 Thus, even if a regulation has an operational discriminatory effect on certain speakers, the regulation will be upheld if the governmental purpose is not related to the content of the speech. However, if the government's purpose is related to the content of speech, courts will review the regulation under the appropriate strict First Amendment standard.

 Because this case is before this court now only for disposition of CFA's preliminary objections, this court has no record from which to evaluate the interest that the Commonwealth seeks to protect. Thus, the court cannot determine whether the Commonwealth's purpose in exempting certain charitable organizations from the Act's requirements is related

to a communicative or noncommunicative aspect of the speech at issue. Accordingly, this court will overrule CFA's preliminary objection challenging the constitutionality of the Act.

### 2. Cause of Action

CFA argues that none of the counts of the Commonwealth's complaint state a cause of action under the Act.

#### a. Count I—Violation of section 5's registration requirements

CFA argues that the Commonwealth has failed to state a claim under sections 5(b)(6) and 5(f), which provide as follows:

**Registration of charitable organizations; financial reports; fees; failure to file**

**(b) Filing of statement.**—It shall be the duty of the president, chairman or principal officer of each charitable organization to file the registration statement, financial report and fee required under this section. The registration statement shall be sworn to by two authorized officers, including the chief fiscal officer of the organization, and shall contain all of the following information:

. . . . .

(6) A copy of any determination of the organization's tax-exempt status under the Internal Revenue Code of 1986 . . . and, for organizations granted tax-exempt status under section 501(c)(3), a copy of the last filed Internal Revenue Service Form 990 and Schedule A for every charitable organization and parent organization.

**5(f) Audit of certain financial reports.**—The financial report of every charitable organization which received contributions in excess of $100,000 shall be audited by an independent public accountant. Except for the charitable organizations described in section 6(a)(3), the financial report of every charitable organization which receives contributions in excess of $25,000, but less than $100,000, shall be reviewed or audited by an independent public accountant. An audit or review is optional for any charitable organization which

receives contributions less than $25,000 or for any charitable organization described in section 6(a)(3) which receives less than $100,000. Audits shall be performed in accordance with the Statement on Auditing Standards of the American Institute of Certified Public Accountants and reviews shall be performed in accordance with the Statement on Standards for Accounting and Review Services of the American Institute of Certified Public Accountants.

CFA argues that the factual basis upon which the Commonwealth bases its charges of violations of the above-quoted provisions, including (1) CFA's filing with the Department of State of an IRS Form 990 for fiscal year 1990 that differed from the 990 Form CFA filed for that year with the Internal Revenue Service; (2) CFA's failure to conduct audits of its 1990 and 1991 financial statements in accordance with Statements of Auditing Standards of AICPA; and (3) the failure of CFA's amended Internal Revenue Service Form 990 for fiscal year 1990 to conform to GAAP, do not support the Commonwealth's allegation that CFA violated the registration provisions.

CFA contends that the Commonwealth has not stated a cause of action for violations under section 5 of the Act because the Act does not provide for the manner in which charitable organizations should complete their federal tax forms. CFA also argues that the Commonwealth's complaint fails to allege that the Department of State issued a rejection of CFA's registration statements and papers under section 5(r), which directs the State Department to review registration materials to determine if the requirements are satisfied within ten days of receipt of the statement.

CFA is incorrect in asserting that, once the State Department reviews a registration statement and determines that the registration requirements are met, an organization is no longer chargeable with violations of the Act even though the Commonwealth later discovers that the organization has not strictly complied with the provisions of the Act. One of the apparent purposes of section 5(r) is to protect charitable organizations from unconstitutional delays by the government

in regulating the First Amendment rights of charitable organizations. *Riley.* The State Department's review is purely administrative in nature, not investigative or prosecutorial. That department is not vested with the power to prosecute organizations for violations of the Act. The Commonwealth is alleging that CFA has violated section 15(a)(1) of the Act, which prohibits charitable organizations from failing to comply with requirements of the Act, including registration requirements.

The Commonwealth avers that CFA filed with the Commonwealth an IRS Form 990 that is different from the one it filed with the IRS. Under section 5(b)(6), charitable organizations such as CFA are required to file *copies of the form* the organization last filed with the IRS. Thus, if the Commonwealth establishes that CFA filed a copy of a 990 Form that varies from the one CFA filed with the IRS, the Commonwealth may be able to establish a violation under the Act.

CFA also contends that the complaint fails to state a cause of action under the Act because the Commonwealth's claim of a violation is based on its assertion that CFA's audit does not comply with GAAP. Although the Act does not specify that GAAP methods control, the Act does indicate that audits should be performed in accordance with the Statement of Auditing Standards of AICPA. Thus, if the Commonwealth proves at trial that those standards include GAAP methods of accounting, the Commonwealth may be able to establish a violation of the Act.

### b. Counts II and III

█ Count II of the Commonwealth's complaint alleges that CFA has violated section 13 of the Act, which provides

(a) **Solicitation limitation.**—A charitable organization may only solicit contributions for the charitable purpose expressed in solicitation for contributions or the registration statement of the charitable organization and may only apply contributions in a manner substantially consistent with that purpose.

The Commonwealth's averments regarding CFA's use of gifts-in-kind, if proven, could support the Commonwealth's allegations that CFA's actions are inconsistent with its statement of purpose. Accordingly, the Commonwealth has stated a cause of action under Count II.

■ This court also concludes that the Commonwealth has stated a claim for which relief could be granted under Count III. The Commonwealth bases Count III on alleged violations of sections 13(d), 15(a)(2) and 15(a)(7).

Section 13(d) prohibits charitable organizations from misrepresenting their purpose or the purpose or beneficiary of a solicitation. CFA argues that it has not acted in any way to mislead donors of the gifts-in-kind regarding the beneficiaries of those donations. However, the Commonwealth's averments are sufficient to describe a violation under this provision. The Commonwealth is seeking to prove that the manner in which CFA operated its gifts-in-kind program, i.e., donating gifts received as contributions to non-cancer-related entities, is inconsistent with CFA's stated purpose and the nature of its solicitations.

Similarly, the Commonwealth also alleges violations of sections 15(a)(2) and 15(a)(7) which (1) prohibit charitable organizations from using unfair or deceptive acts that create confusion or misunderstanding and (2) prohibit misrepresentations regarding the use or benefits of goods or services. The Commonwealth, alleging that CFA misleads potential donors to believe that donated goods are used for its charitable purposes, could prove violations of those provisions at trial. Accordingly, we overrule CFA's objections to Counts II and III.

### c. Count IV—Violation of Section 21

■ In Count IV, the Commonwealth alleges CFA has violated section 21 of the Act, which provides

**Charitable organizations deemed fiduciary**

Every person soliciting, collecting or expending contributions for charitable purposes and every officer, director, trustee and employee of any such person concerned with the

solicitation, collection or expenditure of such contribution shall be deemed to be a fiduciary and acting in a fiduciary capacity.

The Commonwealth avers that CFA breached the fiduciary duty the Act places on charitable organizations by mismanaging and wasting donated gifts. CFA argues that the legislature, in adopting section 21, intended only to impose a fiduciary obligation on persons soliciting contributions in the use of those contributions. However, this court concludes that the provision is applicable because CFA engages in charitable solicitation in Pennsylvania and thus has a duty to potential donors and recipients within the Commonwealth. Additionally, the facts the Commonwealth has pleaded under Count IV are sufficiently specific to give CFA notice of the bases of the Commonwealth's cause of action under section 21. Therefore, CFA's alternative request for a more specific pleading is denied.

### d. Count V—Violation of section 15(a)(4)

The Commonwealth contends in Count V of its complaint that CFA violated sections 15(a)(2), (4) and (7) of the Act. Those provisions state:

**Prohibited acts**

**(a) General rule.**—Regardless of a person's intent or the lack of injury, the following acts and practices are prohibited in the planning, conduct or execution of any solicitation or charitable sales promotion:

. . . . .

(2) Utilizing any unfair or deceptive acts or practices or engaging in any fraudulent conduct which creates a likelihood of confusion or of misunderstanding.

. . . . .

(4) Utilizing a name, symbol or statement so closely related or similar to that use by another charitable organization or other person that the use thereof would tend to confuse or mislead a solicited person.

. . . . .

(7) Misrepresenting or misleading anyone in any manner to believe that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or qualities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have.

The Commonwealth alleges that CFA's written solicitation materials describe a door-to-door solicitation program and local network similar to that used by the American Cancer Society, and that CFA, in fact, does not have local offices.

In order to assert a claim under these provisions of the Act, the Commonwealth was required to allege only that some statement by CFA is similar enough to a statement made by the American Cancer Society that it would create confusion on the part of contributors or mislead them to think that they are contributing to the American Cancer Society.

If the Commonwealth establishes that CFA's solicitation materials describe conduct and activities in the same manner that the American Cancer Society describes its activities, so that potential contributors believe that they are contributing to the American Cancer Society, the Commonwealth may establish a violation under section 15(a)(4).

Although CFA is correct in asserting that the General Assembly could not grant the American Cancer Society a monopoly on door-to-door solicitation, the allegations do not merely aver that CFA's manner of solicitation could create confusion with or mislead potential donors. The Commonwealth is also asserting that CFA's *literature*, which describes the organization's charitable purpose, also creates confusion and could mislead potential donors. The determination of whether or not the statements CFA makes in its solicitation materials are similar to another charitable organization's and therefore lead to confusion, is for a factfinder.

Furthermore, contrary to CFA's contention that its disclaimer of affiliation with the American Cancer Society necessarily avoids a violation of section 15(a)(2) and (4), a factfinder could conclude that CFA's name is similar to the American

Cancer Society's, and that by disclaiming affiliation with several other charitable cancer organizations in one part of its solicitation materials and disclaiming association with the American Cancer Society in a later segment of the materials, the materials are deceptive and create a likelihood of confusion.

Accordingly, CFA's preliminary objections are overruled.

## ORDER

NOW, January 27, 1993, the preliminary objections of the Cancer Fund of America in. the above-captioned matter are overruled.