**PILSEN NEIGHBORS COMMUNITY COUNCIL, and National Consumers Foundation, Plaintiffs,**

v.

**Roland W. BURRIS, Comptroller of the State of Illinois, Defendant.**

No. 80C5501.

United States District Court, N.D. Illinois, E.D.

Oct. 9, 1987.

Harvey Grossman, Roger Baldwin, Foundation of American Civil Liberties Union, Michael P. Seng, Chicago, Ill., for plaintiffs.

William E. Dicks, Jr., Sp. Asst. Atty. Gen., Chicago, Ill., for defendants.

Michael W. Coffield, Charlene L. Holtz, Andrew F. Sears, Coffield Ungaretti Harris & Slavin, Chicago, Ill., amici curiae for the United Way.

### MEMORANDUM AND ORDER

· MORAN, District Judge.

Plaintiffs filed this suit in October 1980 challenging the constitutionality of Illinois' Wage Deductions for United Fund Act (the Act), Ill.Rev.Stat. ch. 127, ¶¶ 371, 372. That statute, as it was enacted in 1961, authorized the Comptroller for the State of Illinois (defendant) to establish procedures by which state employees could contribute money directly from their paychecks to charitable agencies under the "umbrella" of the United Way.[1] Plaintiffs, as charitable organizations, sought to solicit funds in 1980 from state employees pursuant to the Act's provisions, but were denied that right because they were not members of the United Way and because the United Way/Crusade of Mercy (UW/CM) had already solicited funds for the City of Chicago under the Act's provisions.[2] In their

---

1. The language of the original statute defined the organization which may receive funds through state employee wage deductions as the "organization conducting the single, annual, consolidated effort to secure funds for distribution to agencies engaged in charitable and public health, welfare and service purposes, which is commonly known as the United Fund," Ill. Rev.Stat. ch. 127, ¶ 371 (1979). At the time when this law was enacted a few widely known United Fund organizations existed that conducted fund-raising drives for a number of charitable entities. The United Way is the direct descendant of those organizations and the Comp-

troller's office treats the United Way, where it exists and as it comes under various names in the different Illinois communities, as the organization with exclusive rights to the Act's United Fund provisions. Where no United Way organization exists for a particular community the Act's language and the Comptroller's office allows other consolidated drives to qualify as a United Fund.

2. The UW/CM has been exclusively allowed to solicit state employees for contributions under the United Fund provisions of the Act for the Chicago metropolitan area.

initial complaint plaintiffs alleged that the Act's designation of the United Way as the exclusive conduit for state employees' solicited funds violated their rights to free speech and equal protection under the law.

Following this court's denial in January 1983 of defendant's motion to dismiss, the Illinois state legislature enacted the Voluntary Payroll Deductions Act of 1983, Ill. Rev.Stat. ch. 15, ¶¶ 501–505, which repealed the Wage Deductions for United Fund Act and implemented new provisions for the solicitation of state employees. While retaining the language of the old Act in allowing the United Way to continue raising funds through state campaigns, the new Act creates alternative provisions for other "qualified organizations" to participate concurrently with the United Way. Organizations seeking qualification under the Act are required to jump through certain procedural hoops, as established by ¶ 503(b). The United Way, however, qualifies under ¶ 503(c) (United Fund) of the Act, and it does not have to follow the Act's ¶ 503(b) procedural requirements. Plaintiffs challenge the requirement that organizations seeking status as "qualified organizations" pursuant to ¶ 503(b), (1) submit written designation forms indicating that 4,000 or more state employees intend to authorize that organization for withholding; (2) maintain a minimum of 1,500 contributions [3] each year through payroll deduction or get dropped from the designation forms; and (3) disclose to employees the percentage of receipts collected from them that is expended for fundraising and overhead.

Plaintiffs maintain that the Act, even with its new provisions, violates the Constitution. They assert three basic theories: (1) that the Act is an unconstitutionally vague delegation of authority to the Comptroller's office, without specific standards for determining which organizations qualify under ¶ 503(b) and which do not; (2) that the Act unreasonably restricts plaintiffs' First Amendment rights; and (3) that the Act impermissibly favors the United Way

over other charitable organizations, in violation of the Equal Protection Clause of the Constitution.

The new Act is not the only significant event since this suit was first filed. The legal arguments have been shaped and changed by the Supreme Court's intervening decision in *Cornelius v. NAACP Legal Defense & Educational Fund, Inc.*, 473 U.S. 788, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985). Plaintiffs have now moved for summary judgment. Because of that context the issues here, strictly speaking, involve plaintiff's right to relief despite *Cornelius*, not what may have been foreclosed by that decision. We conclude that plaintiffs are not entitled to summary judgment, and their motion is denied.

## FACTS

**Parties**

Plaintiffs Pilsen Neighbors Community Council (Pilsen N.C.C.) and the National Consumer Foundation (N.C.F.) are tax-exempt not-for-profit corporations in compliance with the Illinois Solicitation of Funds for Charitable Purposes Act. Ill.Rev.Stat. ch. 23, ¶¶ 5101–5205. Pilsen N.C.C. acts as a neighborhood association for Chicago's largest Mexican–American community. It organizes and prepares members for leadership roles in the educational, social and economic affairs of Pilsen, coordinates the administration of certain social services and educational institutions, works to improve the basic skills of Pilsen residents and helps develop long term economic and social strategy for Pilsen's development.

N.C.F. provides funds, research and education to consumer and citizen organizations. One such organization is the Illinois Public Action Council, which is a federation of over 75 affiliates, including homeowners' associations, church, tenant and community groups, taxpayers' organizations, labor unions, and health and energy coalitions. Metro Seniors in Action, a federation of 23 senior citizen organizations in

---

**3.** As enacted, the Voluntary Payroll Deductions Act required a maintenance of 2,500 authorizations of qualified organizations. In July 1986 this requirement was amended and reduced to 1,500 authorizations. P.A. 84–1237, § 2.

the City of Chicago, is also supported by N.C.F.

Under the Act the Comptroller has primary responsibility for establishing and regulating the state employee payroll deduction system, and pursuant to this responsibility has promulgated regulations implementing ¶ 503(b). Ill.Reg., Title 80, § 2500.10–2500.70 (1985).

UW/CM and the United Way of Sangamon County are here as *amici curiae*. The United Way acts as an umbrella organization, conducting fundraising activities for a variety of charitable entities. It organizes in individual Illinois communities under a variety of names, including United Funds, Community Chests or Funds, United Drives, and Combined Appeals. United Way organizations and other groups which the United Way of Sangamon County believes qualify as United Funds, are listed in the Directory of United Ways and/or Chests (Directory) which is printed by the United Way of Sangamon County. The United Way of Sangamon County suggests that the Comptroller authorizes the deductions and thereby determines who is listed in the Directory (presumably by conforming his authorization to the Directory listings). It does, however, concede that the Comptroller has not directed it to add or delete any charitable entities from the Directory.[4]

Numerous charitable entities are listed as member agencies in the United Way and are required by that membership to follow certain United Way rules. These member agencies are not permitted to individually solicit funds from employee groups on an organized basis where the United Way conducts employee campaigns. United Way member agencies may not solicit funds or engage in promotional activities of any kind from any source between September 15 and November 1 of each year, which is when the United Way conducts its annual fundraising drive. The United Way also requires that its members are not "agencies whose primary function is cultural, legislative, public relations, formal education, or the conduct of religious activities" (plaintiffs' mem. p. 11).

## Solicitation Campaign

Illinois payroll deduction programs allow state employees to authorize deductions to consolidated drives in support of charitable organizations. Employees may contribute to a United Fund for a particular community in Illinois or to any "qualified organization," but employees do not contribute directly to the specific member agencies within the United Way. Once employees select the community United Way or organization to which they wish to contribute, it is that organization which decides how to distribute the funds. By permitting consolidated drives and restricting individual drives the Act, it is urged, fulfills its purpose of allowing deductions in an administratively convenient manner, with minimal state involvement.

The solicitation of employees in the state workplace is carried out primarily by state employee volunteers, with limited involvement by organizational representatives. The extent of state official involvement in the United Way campaign is contested by the parties.[5] Defendant contends that the

---

**4.** Deposition testimony taken in October 1983 shows that, at least under the old Act, the United Way of Sangamon County, in conjunction with the Comptroller's office, determined which organizations were to be listed in the Directory. (Travers dep., pp. 14–17.) Testimony indicated that input into the list could be made by any interested party. Some non-United Way organizations are listed in the Directory because they qualify as United Fund organizations in areas where the United Way of Illinois is not organized. Jerald Johnson, Executive Director of the United Way of Sangamon County, stated in his affidavit submitted in August 1986, that under the new Act the determination of which

organizations are listed in the Directory is made only by the Comptroller's office.

**5.** The record shows that numerous state officials have visibly engaged in the collective effort to raise funds. Plaintiffs maintain that the multifarious program for soliciting state employees in the Chicago metropolitan area is coordinated by the state steering committee (SC), which is at least in part comprised of state employees, and that this committee acts as a liaison between state officials and the United Way. Defendant's statement of undisputed facts does not deny the SC's existence but merely states that plaintiffs' factual accounts concern the old Act and are therefore irrelevant (defendant's statement of

Comptroller's office has no significant involvement with the coordination efforts of the state steering committee (SC) for the campaign, beyond discussions of the technical and mechanical aspects of processing payroll deductions.

The record shows, uncontested at least as to the time before the new Act was passed, that some state officials helped design UW/CM campaign literature, brochures and graphics; prepared progress reports for the Governor, the Chicago metropolitan chairman and the UW/CM government division director; prepared and distributed statistical information to state employees regarding the value of their contributions; and provided orientation and information sessions in over 300 locations of the 87 participating state agencies. In addition, the steering committee requests of each state agency that a "high level management official" be specified as the person within that particular agency responsible for making the campaign a successful one.[6]

A Department of Transportation employee and member of the SC visits larger agencies to orient their coordinators, and employees of each agency receive literature and brochures concerning United Way and its members' activities. Weekly progress reports are requested by the SC from participating agencies. If a particular agency is having problems soliciting funds a good

fundraiser may be sent to that agency for special aid, such as the showing of movies. Occasionally the United Way has entered the state workplace for a conference with the SC and to assist in training sessions.

Plaintiffs further allege that the state permits United Way agencies year-round access to state employees through the New Hire program and the United Way Community Referral Service. The New Hire program solicits funds from new employees in the same manner that state employees are solicited during the yearly drive. The Community Referral Service is a United Way program designed to give state employees access to services provided by its member agencies, such as treatment for drug dependency. Defendant and *amici* contend generally that these allegations apply only to the old Act and that the new Act covers the solicitation of state employees for both United Funds and any "qualified organization," as that term is defined by the Act.

**Qualified Organizations**

Two organizations have qualified to participate in the workplace campaign under ¶ 503(b). In October 1983 the Illinois Council of Voluntary Health Agencies (ICVHA) asked the Comptroller about possible qualification under ¶ 503(b) of the new Act, and following the promulgation of the Comptroller's regulations in spring 1984 proceeded with a campaign to raise the requisite signatures.[7] In July 1985 ICVHA forward-

---

genuine issues, p. 5). *Amici,* however, state that there is no longer a state SC, but do not direct the attention of this court to any evidentiary support.

Plaintiffs allege, with support, that an employee of the Department of Transportation, Arthur Price, who "has been on loan since 1980 to the SC from the Illinois Department of Transportation," has the primary responsibility for coordinating the UW/CM drive amongst the 87 state agencies. Defendant does not deny this. *Amici* admit that Price coordinates the payroll deduction process, but allege, again without support, that he "does not have any responsibility for coordinating the United Way/Crusade of Mercy campaign in the Chicago area, particularly in the private sector," and that "Price does not work full time, year around on the UW/CM fund-raising solicitation drive" (*Amici* statement of genuine issues p. 13). Price's deposition, dated November 1985, gives no factual support for defendant's allegations:

Q: What are the responsibilities of your present position?
A: I coordinate the United Way Campaign amongst State of Illinois employees in the Chicago area and the collar counties.
(Price dep., plaintiffs' exh. 3, p. 3.)

**6.** The SC also sponsors a kickoff breakfast held on a weekday in September for the coordinators in the various agencies. At the breakfast, information about UW/CM member agencies is presented and awards are given out to those agencies who had outstanding employee participation in the prior year.

**7.** ICVHA is an umbrella organization composed of numerous health groups, including the American Cancer Society, American Lung Association of Illinois, American Heart Association, Arthritis Foundation, Illinois Chapter, and others. In May 1983, ICVHA applied for permission to participate as a United Fund, but this request

ed over 4,000 signatures to the Comptroller, establishing its qualification under ¶ 503(b), and the following month was certified by the Comptroller as a qualified organization. Plaintiffs maintain that ICVHA was able to fulfill the statute's requirements only after great expense.[8] Plaintiffs submit an affidavit by Thomas Baab, executive vice-president of the American Cancer Society and member of the board of directors of ICVHA, which details ICVHA's efforts in compiling over 4,000 employee signatures. The affidavit states that "the total cost for ICVHA and its member agencies was in excess of $25,000" (plaintiffs' exh. 23).

The other entity which has qualified under ¶ 503(b) is Project Mercy, an organization formed to raise funds for famine relief in Africa. It submitted over 4,000 signatures in November 1985. Project Mercy began receiving funds under the Act in February 1987. Plaintiffs contend that Project Mercy's signature campaign coincided with much media focus on its causes and that it received support from high state officials.[9]

There are over 50,000 state employees in Illinois. Total yearly contributions to United Funds in Illinois by state employees average over $200,000. In 1980 it was estimated that state employees contributed an average of $39.07 a year to United Way through the deduction plan (presumably the average of those who did contribute). Pursuant to the Act ICVHA received approximately $3,000 for one payroll period in August 1986. Project Mercy received approximately $1,600 for that same payroll period. According to defendant's estimate, total yearly contributions to these organizations might reach $150,000 and $80,000, respectively.

We note that monetary rewards of the state payroll deduction campaign is of no small importance to the parties involved. Contributions from employees through their workplaces represents a major source of support for these charitable causes, particularly since employees who contribute at work will be less likely to give again later. In addition to the raw resources, the state's involvement in the employee campaign obviously furthers the participating organizations' efforts to enhance and coordinate their outreach.

## DISCUSSION

### I. Plaintiffs' Challenge of Vague Delegation

Plaintiffs complain that the Act is unconstitutional[10] on its face because it "invests the Comptroller with unlimited discretion to admit organizations" to the campaign, "in the absence of definite and objective standards to determine which organizations qualify for admission as United Funds and which must meet the qualification standard of ¶ 503(b)" (complaint p. 10). Par. 503(c) defines a United Fund as

the organization conducting the single, annual, consolidated effort to secure funds for distribution to agencies engaged in charitable and public health,

---

was denied because the UW/CM was already designated as the United Fund.

8. ICVHA's signature campaign had visible support from "such notables as House Minority Leader Lee Daniels and State Senator George Sangmeister." Evidence shows that it hired outside consultants to design and implement the signature collection process and distributed a letter from Governor Thompson requesting that there be no impediments to anyone wishing to sign ICVHA's forms. ICVHA set up tables in cafeterias at large locations of the Illinois Department of Public Aid, after receiving proper permission from the regional administrator. In addition, it exhibited demonstrations on smoking and cancer self-examinations, as a lead-in for the collection of employee signatures.

9. Project Mercy's designation forms were submitted to the Comptroller's office for approval by JoAnne Kron, the Governor's legal counsel, on the Governor's letterhead. This letterhead was then distributed to state employees, along with their designation forms. Defendant contends that this was done by her personally, and not in her official capacity.

10. Although the parties do not raise the issue of abstention, we have considered—but rejected—the notion that this court should abstain from ruling upon the constitutionality of this state law since it is clear that plaintiffs would not be entitled to relief on state law grounds.

welfare and services purposes, which is commonly known as the United Fund, or the organization which serves in place of the United Fund organization in communities where an organization known as the United Fund is not organized.

Plaintiffs specifically challenge that the text of the statute and the Comptroller's office have not defined the "public health, welfare and service purposes" and "in communities" language of the Act.

Plaintiffs argue that the statute regulates speech in terms so vague that it violates their rights to due process and equal protection, and cite cases where penal statutes were held void on grounds of vagueness. *See Hynes v. Mayor of Oradell*, 425 U.S. 610, 96 S.Ct. 1755, 48 L.Ed.2d 243 (1976) (New Jersey municipal ordinance creating a criminal penalty for failure to give advance written warning to local police of door-to-door solication for political causes or campaigns); *Smith v. Goquen*, 415 U.S. 566, 96 S.Ct. 1242, 39 L.Ed.2d 605 (1974) (Massachusetts penal statute making it a crime to publicly treat the U.S. flag contemptuously); *Shuttlesworth v. Birmingam*, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969) (penal statute making it a crime to participate in a parade, procession or other public demonstration without a city permit); *Lanzetta v. New Jersey*, 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888 (1939) (New Jersey penal statute making it a criminal offense to be a gangster); and *Connally v. General Construction Co.*, 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322 (1926) (Oklahoma penal statute authorizing imprisonment for failing to pay specified wages to employees).

The rule that state legislatures cannot delegate unbridled discretion to administrators applies equally to non-criminal regulation of protected speech. *See, e.g., Black United Fund of New Jersey (BUF/NJ)*, 593 F.Supp. 1567, 1579 (D.N.J.1984), *rev'd on grounds of mootness*, 763 F.2d 156 (3d Cir.1985). In *BUF/NJ* the district court reviewed a statute which directed the state treasurer to allow state employees to deduct from their payroll contributions to "a United Fund, Community Chest or United Appeals." New Jersey Statute Annotated ch. 52, §§ 14–15.9c (1984). The language of the statute gave no definition to those terms and the Governor had determined that the statute denoted only those certain funds existing in 1955, when the statute was enacted. Because the United Way was the only direct descendant of those charitable organizations, New Jersey had allowed only the United Way to participate. The court held that the unbridled discretion vested in New Jersey's treasurer to grant or deny participation in a public benefit involving protected speech could not withstand constitutional scrutiny.

> It is well settled law that a state legislature may not vest in an administrative official or governmental authority the unfettered discretion to grant or withhold permission to exercise First Amendment rights. ... A statute regulating speech must include reasonably clear guidelines so as to prevent official arbitrariness or discrimination in its enforcement. ... "proof of an abuse of power in the particular case has never been deemed a requisite for attack on the constitutionality of a statute purporting to license the dissemination of ideas." [*Thornhill v. Alabama*, 310 U.S. 88, 92, 60 S.Ct. 736, 739, 84 L.Ed. 1093 (1940).] ... The fact that the discretion authorized ... is to be exercised in *granting* access to a non-public forum, rather than in *restricting* access to a public forum, is not constitutionally significant.

*BUF/NJ*, 593 F.Supp. at 1579 (citations omitted) (emphasis in original).

■ Defendant and *amici* initially raise a question as to the ripeness of the void-for-vagueness issue. They argue that plaintiffs cannot challenge the Act's delegations on grounds of vagueness since "no situation has presented itself wherein the Comptroller's Office has been called upon to define" the terms of the Act. For support, defendant cites *NAACP Legal Defense and Educational Fund v. Devine*, 567 F.Supp. 401 (D.D.C.1983) (*NAACP III*), *rev'd on other grounds*, 473 U.S. 788, 105

S.Ct. 3439, 87 L.Ed.2d 567 (1985).[11] In *NAACP III* proposed regulations to implement the Presidential Executive Order which created a federal employee wage deductions program had already been announced for public comment. The court there agreed that the Act's terms might be made more concrete by the proposed regulations and did not address the vagueness claim.

This argument is inapplicable here. Despite the fact that the terms in ¶ 503(c) have been Illinois law since 1961, the Comptroller has not indicated that he intends to give a more definitive interpretation to the Act's language. The Comptroller has already promulgated regulations designed to implement the new provisions, and they do not include rules for the application of the challenged terms. Indeed, it is in part because defendant has not defined those terms in the form of regulatory rules that plaintiffs now challenge the Act on grounds of vagueness. Still, the Comptroller must have had some definition of these terms in mind when his office determined that UW/CM is the exclusive United Fund for the City of Chicago. We find this issue ripe for review.

■ While the Illinois legislature cannot grant defendant unbridled discretion to admit and deny participation of plaintiffs, the Act sufficiently defines "United Fund" to escape the constitutional challenge elicited in *BUF/NJ*. Unlike the New Jersey statute which left the terms "United Fund" completely undefined, the text sets forth in fairly clear terms that a United Fund is the single, annual consolidated drive to raise funds for a number of charitable agencies. The Act contemplates flexibility in determining which communities are not concurrently covered by another United Fund. Such flexibility, within the clear intent of the statute, does not amount to unconstitutional vagueness. While neither the Act nor the Comptroller's regulations delineate what is to be considered a community and what are public health, welfare and service

purposes, there is sufficient direction given to defendant to limit the exercise of his discretion.

Plaintiffs also allege that the Act delegates to the United Way of Sangamon County the power to determine who is a United Fund. Defendant insists that he decides. Each assumes that the initial decision as to listing in the Directory has significant legal relevance. This court disagrees. We assume, for the purpose of this motion, that the United Way of Sangamon County prepares the Directory without input from the Comptroller. We also assume that if a charitable entity thought that it should be listed and wasn't, and if it wanted to participate in the state campaign, it would complain both to the United Way of Sangamon County and the Comptroller. There have been no such complaints.

Up to now this court has been considering both the facts and the legal issues in the context framed by the parties, and that context leaves me with a profound sense of discomfort. Part of that discomfort stems from some uncertainty about the limits of judicial notice. The parties and *amici* focus upon the relationship of the United Fund to the state campaign; there is nothing, or virtually nothing in the records about the structure of charitable giving generally in Illinois. It is almost as if the United Funds were creatures developed for the purpose of tapping into the largess of the state campaign. There is, at least implicitly, an acceptance of the view that governmental reliance upon private decisionmaking is suspect. But the view that United Funds are creatures of the Act itself is not as this court understands it to be and that view is not one this court accepts.

In this pluralistic society of ours much that can be described as intended to benefit the public welfare arises from private action. Indeed, the plaintiffs in this action are private entities devoted to the public welfare and they are represented by coun-

**11.** The district court ruling in *NAACP III* is the decision appealed from in the Supreme Court judgment of *Cornelius v. NAACP Legal Defense Fund,* 473 U.S. 788, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985), discussed *infra* at 5. The district court denied review of plaintiffs' vagueness claims on grounds of ripeness, and that decision was not reviewed in *Cornelius.*

sel who have undertaken their representation for that same general purpose. Government often, and quite properly, relies on private action to inform and control its actions, whether that private action be as structured as stock exchange rules, safety standards or law school accreditation, or as unstructured as an organization's telegram to a congressman. That reliance cannot be uncritical, at least when that reliance is upon structured private action. Government cannot avoid constitutional limitations by relying upon private action; its action is tainted if the private action is tainted by impermissible considerations. If, for example, the concept of "United Fund" had no content the new Act would not be rescued by delegating to the United Way of Sangamon County the preparation of a Directory. Similarly, if Pilsen was denied membership in the United Way because it served a primarily Hispanic neighborhood, the Comptroller could not rest upon that private entity's refusal as reason enough to deny Pilsen access to the state campaign.

It is this court's understanding (although the record is rather barren) that the concept of "United Fund" has content, and plaintiffs do not contend that they are denied participation by impermissible private action. It is this court's understanding that the United Fund concept is well understood throughout the state. Through a process of time and local interaction umbrella groups have been devised to carry forward single coordinated fund drives. Those drives are aimed primarily toward private giving unrelated to government. They solicit individuals directly and through the private workplace. The state campaign is important primarily in those localities having substantial state government employment, and the state's role is substantially similar to that of a private employer who chooses to play the part of a "good citizen employer" by facilitating the private giving of its employees for charitable purposes. The identity of the United Fund in an area is well known to those in the area, although its scope and configuration may well differ markedly from a United Fund in another area with differing

needs and problems. The new Act defines "United Funds" in that context. The Directory listing is a compilation of historical facts, much like a listing of public and private schools accredited for participation in an annual "round robin" sports tournament. The Comptroller relies upon the Directory because it is an accurate listing of United Funds as commonly understood and as defined by statute. If this court's understanding is correct, the identification of United Funds, far from being overly vague, is virtually beyond dispute. If that is so, then it is understandable that no one has come forward to complain that it is, indeed, a United Fund but has been excluded either in the Directory or by the Comptroller.

## II. Plaintiffs' First Amendment Challenge

■ That the state acts as an employer does not, however, mean that it is as free from constraints as a private employer. Plaintiffs challenge ¶ 503(c) of the new Act, alleging that that section unconstitutionally requires membership in the United Way as a prerequisite to the solicitation of employees in the state workplace. They challenge the ¶ 503(b) procedural requirements as an unreasonable alternative in light of their First Amendment rights. All parties agree that charitable solicitation of funds is a form of protected speech. *Cornelius v. NAACP Legal Defense and Educational Fund, Inc.*, 473 U.S. 788, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985); *Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73, *reh'g denied*, 445 U.S. 972, 100 S.Ct. 1668, 64 L.Ed.2d 250 (1980). The fact that solicitation is carried out through a payroll deduction program rather than face-to-face solicitation does not render such solicitation undeserving of First Amendment protection. *Cornelius*, 473 U.S. at 799, 105 S.Ct. at 3447. In resolving plaintiffs First Amendment claims this court must analyze the type of forum created by the Illinois statute and then determine whether the restrictions imposed comply with the constitutional mandate.

## A. Forum analysis

■ The determination that solicitation through Illinois' payroll deduction campaign involves protected speech does not end the inquiry into plaintiffs' right of access. As the Supreme Court stated in *Cornelius:*

> ... Even protected speech is not equally permissible in all places and at all times. Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities.

473 U.S. at 799–800, 105 S.Ct. at 3447–3448. Speakers can be excluded from *traditional public fora* only when the restriction is necessary to serve a compelling state interest and is narrowly drawn to achieve that interest. *Perry Education Association v. Perry Local Educators' Ass'n,* 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). Content neutral time, place and manner restrictions may also be imposed only if they are narrowly tailored to serve a significant government interest and leave open ample alternative channels of communication. *Id.* Where access is sought to a *non-public forum,* the court's scrutiny is significantly less piercing. The Court in *Cornelius* reiterated the rule that

> [a]ccess to a nonpublic forum ... can be restricted as long as the restrictions are "reasonable and [are] not an effort to suppress expression merely because public officials oppose the speaker's view."

473 U.S. at 800, 105 S.Ct. at 3448 (citing *Perry Education Association, supra* ).

In *Cornelius,* the Court analyzed the type of forum being sought by plaintiffs' legal defense funds in a case similar to the one here. Plaintiffs there complained that they could not constitutionally be excluded from participating in the Combined Federal Campaign (CFC), a program for the solicitation of federal employees by charitable agencies. By Executive Order the CFC specifically excluded "agencies that seek to influence the outcomes of elections or the determination of public policy through political activity or advocacy, lobbying, or litigation on behalf of parties other than themselves." Executive Order No. 12353, § 2(b)(3). The Court held that such exclusion did not violate plaintiffs' constitutional rights. In its forum analysis the Court determined that CFC was a non-public forum because it was the clear intent of the President, whose orders created the program, that CFC be limited to "appropriate" voluntary agencies:

> The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a non-traditional forum for public discourse. ... Accordingly, the Court has looked to the policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum.

*Cornelius,* 473 U.S. at 802, 105 S.Ct. at 3449 (citations omitted).

Plaintiffs attempt to distinguish *Cornelius* on the grounds that the Illinois law features face-to-face solicitation of employees in the state workplace. They argue that the appropriate forum is not the payroll deduction campaign but the state workplace itself. We find this argument unpersuasive. First, the same sort of face-to-face solicitation of federal employees by other employees seemed to be present in the CFC. *See Cornelius,* 473 U.S. at 810, 105 S.Ct. at 3453. Second, there is no indication that the Illinois legislature intended to open up state workplaces as fora available to any charitable organization. In fact, ¶ 502 states that it is the objective of the Act to "provide a convenient *channel* through which State public servants may contribute to [the] efforts [to meet needs of human health and welfare; and] to minimize or eliminate disruption of the State workplace and costs to State taxpayers that such fundraising may entail...." Ill.Rev.Stat. ch. 15, ¶ 502 (emphasis added). Third, the fact that the Illinois statute allows only umbrella or qualified organizations to participate in the campaign provides a strong inference that the state did

not intend the campaign to be open to all registered charitable institutions.[12] The numerosity and maintenance requirements of the new Act, ¶ 503(b), further exhibits a legislative intent to limit participation to the few large drives which seek funds for a number of charitable organizations. We conclude that, as a matter of law, the Illinois Act creates a non-public forum.

**B. Reasonableness of ¶ 503(b)**

█ Given this holding as to forum, this court must determine whether plaintiffs have evidenced uncontested facts sufficient to find that the requirement of a consolidated drive under the rubric of the United Way works an unreasonable restriction on their protected speech.

As this court stated in its 1983 memorandum and opinion:

> It appears highly unlikely that plaintiffs could demonstrate that a state insistence upon one solicitation in the workplace, rather than many, is not a reasonable time, place and manner requirement and not rationally related to legitimate state interests.

*Pilsen Neighbors Community Council,* slip op. at 3 (citing *National Black United Fund, Inc. v. Devine,* 667 F.2d 173 (D.C. Cir.1981)). Illinois has a clear interest in confining the solicitation of state employees in the workplace to single united drives, and now that the Illinois legislature has enacted ¶ 503(b) as an alternative method for participation, discussed *infra,* the claim that this provision violates plaintiffs' First Amendment rights is even more attenuated.

Plaintiffs buttress their challenge by arguing that First Amendment associational rights prohibit the state from requiring their membership in the United Way. Under some circumstances the First Amendment does prevent the state from requiring association with a private entity as a prerequisite to receiving public benefits. For example, patronage dismissal of some public employees because of their affiliation with a particular political party may violate the First Amendment, particularly where such affiliation would not interfere with the employees' performance. *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980); *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). The rationale for these decisions was set out by the Court in *Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972):

> [The government] may not deny a benefit to a person on a basis that infringes his constitutionally protected interests, especially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited.

*See also Gavett v. Alexander,* 477 F.Supp. 1035 (D.D.C.1979) (law requiring membership in the National Rifle Association as a prerequisite to receiving discount on the purchase of a rifle violates First Amendment associational rights). As discussed above, however, it is clear that the state often does rely upon private entities to inform and control its actions, and properly so. Not all associational requirements, therefore, constitute a violation of fundamental rights. *See, e.g., Besig v. Dolphin Boating and Swimming Club,* 683 F.2d 1271 (9th Cir.1982) (requirement of membership in groups of "apolitical nature" which "advocate no special view or philosophy that appellants have identified as offensive" in order to receive favorable access to public land not in violation of First Amendment).

Plaintiffs might be able to substantiate their claim that the Act's United Way membership requirement violates the First Amendment if such membership would be unreasonable in light of plaintiffs' protected interests and if the alternative provisions of ¶ 503(b) also prove unreasonable. Plaintiffs, however, allege only that they are not members of the United Way and, therefore, cannot qualify under ¶ 503(c).

---

**12.** Defendant and *amici* contend that there are over 8,000 registered tax-exempt organizations in Illinois.

While it is far from conclusive, the facts raise some questions as to why plaintiffs desire to refrain from association with the United Way. But those facts do not show that plaintiffs are unable to join the UW/CM,[13] or that membership in the UW/CM would somehow intrude upon their views, practices or methods.[14] Instead, plaintiffs argue broadly that the First Amendment associational protections prevent the state from requiring their membership in the UW/CM as a prerequisite for public benefits.[15] Without showing more, we cannot grant plaintiffs summary judgment on this claim.

**13.** The United Way places certain limitations on its member agencies, discussed *supra* at 5, but plaintiffs do not allege that they are unable to meet them. In addition, plaintiffs imply that the United Way requirement that member agencies be established for two years prior to association "can serve to discriminate against 'the poorly financed causes of little people'" (plaintiffs' mem., p. 52). *Amici* deny these claims, offering evidence that there are provisional procedures for recognition of charitable agencies that have not been established for two years (*Amici* statement of genuine issues pp. 10–11). *Amici* also state that UW/CM does "include several causes of little people" (*Amici* mem., p. 16 n.).

**14.** A similar claim was addressed in *National Black United Fund v. Campbell,* 494 F.Supp. 748 (D.D.C.1980), *rev'd sub nom., National Black United Fund v. Devine,* 667 F.2d 173 (D.C.Cir. 1981). There the district court, deciding whether membership in the United Way presented a reasonable alternative to the Fund's direct participation in the federal employee solicitation campaign, held that such an alternative was not "effective." The court there stated:

> As to affiliation with the United Way the plaintiff contends that such a move would be counter-productive to its goals and purposes. NBUF advances the argument—which has considerable merit—that its goals, priorities and emphasis are focused on programs designed to combat prejudice and discrimination, whereas the United Way's emphasis is upon old-line organizations and programs which, although of unquestionable merit and worth, fail to address and concern the basic and central economic and social problems *ever present in a minority community.*

494 F.Supp. at 757.

The court of appeals rejected this finding and reversed. 667 F.2d at 180. In reviewing the lower decision, the court of appeals wrote:

> [A]lthough the context may give meaning to the expression ... appellee did not show that its pamphlet message would convey a differ-

ent meaning if it were listed with a local affiliate of UWA [United Way]. Nevertheless, NBUF maintains that "differences in the philosophies of the United Way and NBUF" would require NBUF to "change its program" if it participated as a local agency..... While we are not insensitive to the importance of associational freedom, NBUF provided little evidence, and no specific prediction, of how its activities would be affected by affiliation with the local United Ways.... Indeed, there is evidence that many local federations provide substantial funds to minority-oriented organizations and that agencies with goals similar to NBUF's have been able to participate through United Ways with no apparent impact on their message or their program.

*Id.* (citations omitted).

**15.** Plaintiffs claim that their associational rights hinge upon more than *political or ideological* orientation and include the right to associate for social purposes. Yet plaintiffs offer no fact which conclusively shows that such an association would affect their political, ideological *or social* interests. *National Black United Fund v. Devine,* 667 F.2d 173 (D.C.Cir.1981). This court has not been shown any clear reason for plaintiffs' reluctance to associate, other than to get the jump over the other charitable entities who participate in Illinois' payroll deduction program through the United Way.

Despite an extensive discussion by plaintiffs on the law of associational rights, defendant and *amici* neglect to address the legal issues involved. Instead, defendants and *amici* simply state that the alternative measures set forth in § 503(b) provide plaintiffs with a channel into the solicitation process without such membership. While that may be true, a resolution of plaintiffs' associational rights is central not only to the First Amendment claim but also to the inquiry into whether the Act creates an invidious discrimination in violation of plaintiffs' right to equal protection. *See infra* at 27–30.

## C. Reasonableness of ¶ 503(b)

Plaintiffs maintain that the alternative procedural requirements of the Illinois Voluntary Payroll Deductions Act unreasonably restrict their First Amendment rights to solicit funds.

### 1. Standing

■ As an initial matter, defendant maintains that plaintiffs lack standing to challenge ¶ 503(b) as unconstitutionally burdensome since they have not attempted to meet those requirements. Defendant contends that plaintiffs' argument "is spec-

ulative, based upon conjecture, and there is merely a hypothetical effect upon plaintiffs and similar groups. As such, there is no case or controversy" (defendants' mem. p. 14).

The constitutional and prudential standing doctrines restrict judicial power to "cases" and "controversies," requiring parties to have an actual interest in the cause before the court. The "injury in fact" element in the law of standing requires that federal jurisdiction "can be invoked only when the [plaintiffs themselves have] suffered 'some threatened or actual injury resulting from the putatively illegal action ...'." *Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975) (citations omitted). *See Data Processing Service v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). Purely hypothetical or conjectural claims of injury are not sufficient. *City of Los Angeles v. Lyons,* 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983).

Plaintiffs applied for access to the state's payroll deduction program in 1980, and this access was denied. This court held that at that time plaintiffs had standing to challenge the provisions of that Act. *Pilsen Neighbors Community Council v. Burris,* slip op. at 1 (N.D.Ill.1983). Plaintiffs now challenge the new ¶ 503(b) requirements on grounds that they are unreasonable, prohibitively expensive and violate their First Amendment rights.

Because plaintiffs have "alleged such a personal stake in the outcome of the controversy," *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962), this court finds that plaintiffs have standing. We will not withdraw plaintiffs' standing simply because the Illinois legislature modified the procedures of the old Act, unless such modifications rendered plaintiffs' claims moot.[16] Plaintiffs have a clear interest in the solicitation of state employees and have adequately alleged injury by the denial of their status as a United Fund. Plaintiffs convincingly argue that they cannot meet the new alternative requirements and defendant is unable to allege any facts which contest this claim. In light of such futility, plaintiffs are not required to reapply.

### 2. Reasonableness

Since this court has determined that the Illinois Act creates a non-public forum, the procedures required of plaintiffs must only be reasonable and not intended to restrict speech based upon the content of the views expressed. On this motion for summary judgment it cannot be said that these requirements are not reasonably related to permissible state purposes.

Plaintiffs' evidence shows that the cost of conducting a signature campaign in order to qualify for participation could run as high as $25,000. They offer a detailed affidavit which supports this contention. While defendant and *amici* allege that this sum may have been spent on unnecessary items, they offer no evidence that would show the effect to be less costly. Even on plaintiffs' motion for summary judgment, the court accepts their contention that the cost of obtaining 4,000 signatures would rise to such a level.

This court also believes plaintiffs' statement that they could not reasonably afford such an expenditure. However, the ques-

---

**16.** Defendant does argue that many of plaintiffs' allegations are rendered irrelevant by the new Act. This claim raises the issue of mootness, which was the reason why one case with similar facts was reversed on appeal. *Black United Fund of New Jersey v. Kean,* 763 F.2d 156 (3rd Cir.1985). In *BUF/NJ,* the New Jersey district court found that the state's designation of the United Way as exclusively entitled to payroll deductions violated plaintiff's constitutional rights to free speech and equal protection. The facts of that case presented a statute very similar to the old Illinois statute here. Before the appeal in that case, however, New Jersey repealed the old law and enacted a new one. The new New Jersey statute establishes a state coordinating agency to conduct voluntary payroll deduction campaigns in a manner which treat United Way agencies and other charitable organizations on equal footing. This procedure, which differs from the new Illinois Act, cured the New Jersey statute of its unconstitutional character. The alternative provisions here differ in that the new Illinois Act preserves the qualification of United Way. This court accordingly granted leave for plaintiffs to amend their complaint, and their claims are not moot.

tion is not whether the requirements work a barrier to plaintiffs' entry, but whether these requirements are reasonable in light of the state program. On the face of the Act,[17] these requirements apply equally to qualified organizations and are reasonably related to the state's intent to allow deductions to go to umbrella organizations which will then distribute proceeds to their member agencies.

Plaintiffs additionally complain of ¶ 503(b)(6), which requires qualified organizations to disclose the percentage of their expenditure on administrative and fundraising costs to employees on all petitions and payroll deduction designation forms. They argue that such disclosure is unnecessary to prevent fraud since charitable organizations are already required to disclose these figures to the state. They claim that this disclosure will reflect negatively in the eyes of contributors, making it more difficult to achieve the initial 4,000 signatures and maintain 1,500 contributions a year thereafter.[18] As with the numerosity requirement, we do not weigh the burden of ¶ 503(b)(6) according to whether plaintiffs can meet it, but whether it is reasonable in light of the state's purposes. This court does not think it unreasonable for employees to be informed of administrative costs, particularly when the organization is not well known to potential contributors. As the Supreme Court emphasized in *Schaumburg v. Citizens for Better Environment*, 444 U.S. at 638, 100 S.Ct. at 836, "efforts to promote disclosure of the finances of charitable organizations ... may assist in preventing fraud by informing the public of the ways in which their contributions will be employed. Such measures may help make contribution decisions more informed, while leaving to individual choice the decision whether to contribute to organizations

that spend large amounts of salaries and administrative expenses."

The record shows that two organizations, the ICVHA and Project Mercy, have both been able to meet the ¶ 503(b) requirements. While their success is not conclusive evidence of reasonableness, they appear to be umbrella organizations deserving of participation alongside the United Way. Plaintiffs, however, are charitable organizations much like those participating as member agencies of the United Way. Those member agencies would also have a difficult time in individually meeting the Act's prerequisites. Given the state's insistence on consolidated drives, however, this does not make the numerosity, maintenance and disclosure requirements unreasonable restrictions on plaintiffs' First Amendment rights.

### III. Plaintiffs' Rights to Equal Protection

We now turn to the issue of equal protection. "When a state distributes benefits unequally the distinctions it makes are subject to scrutiny under the Equal Protection Clause of the Fourteenth Amendment." *Zobel v. Williams*, 457 U.S. 55, 60, 102 S.Ct. 2309, 2312, 72 L.Ed.2d 672 (1982).

Plaintiffs complain that they are denied equal protection on two grounds. First, they challenge the Act on its face, claiming that the grandfather clause granting automatic entitlement only to United Way organizations creates an invidious classification which is not rationally related to a legitimate state interest. Second, they allege that the Act is unequally enforced, allowing some non-United Funds to participate despite their non-status as "qualified organizations" and despite the denial of such same treatment to plaintiffs. We deal with each claim separately.

---

**17.** Plaintiffs also maintain that it is a practice in some Illinois communities to allow non-United Funds to participate in the campaign, despite the fact that they have not qualified under § 503. This claim raises the spectre of content-based discrimination as is dealt with *infra* at 30–32.

**18.** Plaintiffs' primary complaint against this provision is based on the fact that qualified

organizations are forced to make such disclosures but United Way is not. Given the fact that the disclosure requirement itself is reasonable, it is the unequal application of that requirement which might give plaintiffs' case some merit. Our determination on the equal protection issue, *infra* at 27–30, does not allow this court to grant summary judgment on this issue.

## A. The Special Status of United Way Organizations

■ Plaintiffs complain that the Act's procedural requirements are discriminatorily imposed upon them but not United Way organizations, in violation of the Equal Protection Clause. Plaintiffs allege that the grandfather provisions of ¶ 503(c) continue to afford the United Way special entitlement which "preserve[s] the status quo for a privileged group of charities" (plaintiffs' mem. p. 33). Plaintiffs claim that "[g]randfather clauses are especially invidious to First Amendment rights because they prevent new ideas, new messages, [and] new causes from being brought before the public" (plaintiffs' mem. p. 34).

Where an unequal distribution of a government benefit follows a suspect classification or impinges on fundamental rights, the discriminatory process must be strictly tailored to a compelling governmental interest ("strict scrutiny"). Where the classification is not suspect and does not impinge upon a fundamental right, courts employ the "rationally related to a legitimate state interest" test. *Zobel*, 457 U.S. at 66, 102 S.Ct. at 2316; *Massachusetts Board of Retirement v. Murgia*, 427 U.S. 307, 312, 96 S.Ct. 2562, 2566, 49 L.Ed.2d 520 (1976); *Sklar v. Byrne*, 727 F.2d 633 (7th Cir.1984).

Because the restriction here involves access to a non-public forum, no fundamental interest is infringed and, therefore, the Act's distinctions must be only reasonable in light of the state's interests. *Perry Education Association v. Perry Local Educators' Ass'n*, 460 U.S. 37, 54, 103 S.Ct. 948, 959, 74 L.Ed.2d 794 (1983). *See also Monterey County Democratic Central Committee v. United States Postal Service*, 812 F.2d 1194 (9th Cir.1987). In *Perry*, the Court reviewed a school policy which allowed a recognized union access to the school's mail system but denied such access to an unrecognized union. The Court held that unequal restrictions to this non-public forum—even those based upon the identity of the speaker—are not to be judged by the more strict equal protection standard. *Perry*, 460 U.S. at 54, 103 S.Ct. at 959. The Court distinguished cases where restrictive classifications affecting speech were strictly scrutinized, holding that the level of review depends upon the type of forum created.[19] "On government property that has not been made a public forum, not all speech is equally situated, and the State may draw distinctions which relate to the special purpose for which the property is used." *Id.* Since it was rational for the state to allow a collective bargaining representative to use its mail system while denying similar access to a union not having that status, the Court held that the exclusion did not violate the Equal Protection Clause.

This court need not resolve whether the presumptive inclusion of the United Way in Illinois' payroll deduction campaign is rationally related to a state interest since on plaintiffs' motion for summary judgment it cannot be conclusively shown that the Act creates a privileged classification to which plaintiffs and similarly situated charitable organizations are denied. Once a United Fund is established for a particular community other entities seeking solicitation for that community may join the consolidated drive or qualify under ¶ 503(b). In the City of Chicago the UW/CM has long been recognized as the United Fund organization. Antecedent to their equal protection claim, plaintiffs must show that they cannot reasonably be made to participate in the solicitation process through the UW/CM. That they have as yet failed to do.[20]

---

**19.** The Court rejected the argument that *Police Department of Chicago v. Mosley*, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972), and *Carey v. Brown*, 447 U.S. 455, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980), established the rule that all restrictions upon speech required strict scrutiny.

**20.** If the United Funds' structure is as this court believes it to be, the member organizations have already survived the informed scrutiny of the umbrella organization. Information respecting one organization may well be more pertinent than information respecting group averages. There may be other reasons as well for distinguishing between United Funds and qualified organizations, even if plaintiffs could not participate as United Fund members, but, for the

**310**

### B. Participation of Non–United Fund Agencies

We now turn to the final claim raised by plaintiffs' complaint. Plaintiffs maintain that some non-United Funds other than themselves are permitted by the United Way to participate despite their non-United Fund status. As this court wrote in our previous ruling in this case, this contention "raises the spectre of content-based discrimination." *Pilsen Neighbors Community Council v. Burris, supra,* slip op. at 3.

Defendant again raises the preliminary issue of plaintiffs' standing. Although plaintiffs offer uncontested evidence that non-United Funds were arbitrarily able to participate under the old Act, defendant claims that when "a single isolated incident of alleged arbitrary and discriminatory enforcement occurs, and the possibility of repetition of those acts are conjectural, the standing element of the requirement of a case or controversy is not met" (defendant's mem. p. 25). Defendant cites *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976) and similar decisions which analyze the standing of parties to sue for an injunction. There, however, the plaintiffs, complaining of specific police practices, were not able to allege that they would themselves come into contact with police on adversarial terms in the future. In those circumstances the courts have been very reluctant to find standing. Here it is clear that plaintiffs have been excluded from participation in the past and will continue to be so restricted unless they fulfill the Act's requirements. The cases which defendant cites are inapposite.

The evidence shows that the practice of allowing non-United Funds to participate in the campaign was not an "isolated incident of alleged arbitrary and discriminatory enforcement" but was, at least in the past at some times, an accepted pattern. In his deposition in October 1983, Edward Travers, then the executive director of the United Way of Sangamon County, testified that some 21 non-United Fund charities received money through the payroll deduc-

moment, that lies in the realm of uninformed

tion plan and that disbursement to non-United Funds was an historical practice of that United Way. Defendant offers an affidavit which claims that such a practice no longer occurs since passage of the new Act. The issue is obviously a contested matter and cannot be disposed of on plaintiffs' motion for summary judgment.

### CONCLUSION

Because there are disputed facts which cannot now be resolved, and for the reasons stated herein, plaintiffs' motion for summary judgment is denied.