**PILSEN NEIGHBORS COMMUNITY COUNCIL and National Consumers Foundation, Plaintiffs–Appellants,**

v.

**Dawn Clark NETSCH, Comptroller of the State of Illinois, Defendant–Appellee.**

No. 91–1374.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 5, 1991.

Decided April 3, 1992.

Michael P. Seng (argued), Jane M. Whicher, and Harvey M. Grossman, Roger Baldwin Foundation, Chicago, Ill., for plaintiffs-appellants.

Rosalyn B. Kaplan, Asst. Atty. Gen. and Thomas R. Dodegge (argued), Office of the Atty. Gen., Chicago, Ill., for defendant-appellee.

Robert L. Graham and Ellen L. Partridge, Jenner & Block, Chicago, Ill., for amicus curiae.

Before CUMMINGS and MANION, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

CUMMINGS, Circuit Judge.

Plaintiffs Pilsen Neighbors Community Council ("Pilsen Neighbors") and National Consumers Foundation ("NCF") challenge the constitutionality of the Illinois Voluntary Payroll Deduction Act, which allows Illinois state employees to direct a specified portion of their pay to certain participating charities. Pilsen Neighbors and NCF are tax-exempt, non-profit corporations who applied unsuccessfully to the Illinois Comptroller's Office in 1980 for qualification under the Act's predecessor statute. They allege in their complaint for declaratory judgment and injunctive relief that their exclusion from the deduction program violated their right to free expression and association under the First and Fourteenth Amendments, as well as their right to due process and equal protection under the Fourteenth Amendment. In October 1987, Judge Moran denied plaintiffs' motion for summary judgment. 672 F.Supp. 295. The case was later transferred to Judge Leinenweber, who granted defendant's motion for summary judgment in January 1991. Plaintiffs appeal.[1]

## I.

### A. *The Voluntary Payroll Deductions Act of 1983*

When this suit was filed in October 1980, the Illinois state employees' charitable deduction program was governed by the Wage Deductions for United Fund Act, Ill. Rev.Stat. ch. 127, ¶¶ 371, 372 (1981). This Act, as its title implies, allowed only United Funds to participate in the payroll deduction program. A United Fund was defined as

> The organization conducting the single, annual, consolidated effort to secure funds for distribution to agencies engaged in charitable and public health, welfare and service purposes, which is commonly known as the United Fund, or the organization which serves in place of the United Fund organization in communities where an organization known as the United Fund is not organized.

*Id.* ¶ 371. It is apparent that this definition referred to organizations that conduct workplace fundraising drives in a particular community on behalf of a group of charities in that community. These organizations, commonly known as United Ways, Community Chests, United Appeals, or United Funds, typically conduct a highly publicized fundraising drive, and a large percentage of the contributions come from payroll deductions made by workers in the private sector.[2]

The Illinois legislature repealed the Wage Deductions Act in 1983 and replaced it with the Voluntary Payroll Deductions Act of 1983, Ill.Rev.Stat. ch. 15, ¶¶ 501–505 (1991) ("VPDA"). Since the plaintiffs ask only for injunctive and declaratory relief, the VPDA, not its predecessor, is at issue in this appeal. The articulated purpose of the VPDA is

> to lessen the burdens of State government and of local communities in meeting needs of human health and welfare; to provide a convenient channel through

---

1. *Amicus Curiae* National Committee for Responsive Philanthropy filed a brief in favor of reversal.

2. The reference in the statute to organizations that "serve in place of the United Fund" is obscure and seems to have been largely ignored in practice. Plaintiffs do not seriously argue that they serve in place of the United Fund.

which State public servants may contribute to these efforts; to minimize or eliminate disruption of the State workplace and costs to State taxpayers that such fund-raising may entail; to serve needs of human health and welfare; and to ensure that recipient agencies are responsible in the uses of the moneys so raised.

¶ 502. Under the VPDA, state employees may authorize the withholding of a portion of their salary for contribution to a maximum of four participating charities. ¶ 504.

A charitable organization may participate in the program either as a United Fund under Paragraph 503(c) or as a "Qualified Organization" under Paragraph 503(b). The VPDA retains in Paragraph 503(c) the same definition of United Fund that existed in the statute it replaced. Therefore, like its predecessor, the VPDA grants to those organizations qualifying as a United Fund automatic access to the state employees payroll deduction program.

The VPDA differs from its predecessor by permitting Qualified Organizations other than United Funds to solicit contributions from state employees. Paragraph 503(b) sets forth the steps that an organization must take before becoming a Qualified Organization:

1) Submit the signatures of at least 4000 employees within a 12–month period.[3] Each signature must indicate that the organization is one for which the employee intends to authorize withholding.

2) Certify that all benefiting agencies are tax exempt under the Internal Revenue Code, comply with the Illinois Human Rights Act, and comply with Illinois law regulating the solicitation of funds by charities.

3) Certify that all benefiting agencies actively conduct health or welfare programs and provide services to individuals directed at one or more of an enumerated list of 18 common human needs within a community (e.g., family and child care services, or health care services); and that all benefiting agencies provide these services to persons in the community and surrounding area in which the organization conducts its fund drive (unless the agency provides disaster relief services).

4) Certify that the organization has accurately disclosed its percentage of fundraising and overhead costs.

5) Certify that all benefiting agencies use a majority of the funds received in a particular community if so requested by the employee.

6) Certify that neither the organization nor its member organizations will solicit State employees for contributions at their workplace, except pursuant to the VPDA.

7) Provide one of the enumerated health and human care services for at least 2 years before becoming qualified.

In order to remain a participant in the state workplace charitable deduction program, a Qualified Organization must receive at least 500 payroll deduction requests during each solicitation period. If a Qualified Organization fails to receive 500 deduction requests, it must repeat the entire qualification process outlined above. During each campaign, Qualified Organizations also must disclose their percentage of fundraising and overhead costs "to all solicited employees * * * in the form of a factual statement on all petitions and payroll deduction authorization cards." ¶ 503(b)(6).

3. Illinois regulations govern how charitable organizations can obtain these 4000 signatures. Under 80 Ill.Admin.Code § 2650.20,
 a) Organizations can use public access areas of state agencies to set up information dissemination points and to request signatures.
 b) The organizations must comply with the other requirements of Ill.Rev.Stat. Ch. 15, ¶ 503(b) before they may seek signatures.

 c) No state agency may discriminate against any charitable organization seeking recognition.
 d) No employee may circulate a petition on behalf of any charitable organization during working hours in the work place.
Additionally, 80 Ill.Admin.Code Section 2500.51 specifies the language that is required on each signature form.

Unlike organizations qualifying under Paragraph 503(b), an organization that qualifies as a United Fund under Paragraph 503(c) need not obtain 4000 signatures to become eligible for the program. It also need not certify the services and status of its benefiting agencies, nor disclose its fundraising and overhead costs, nor obtain 500 deductions each year in order to remain in the program.

The Illinois Comptroller is responsible for certifying United Funds and Qualified Organizations under the Act, and also has authority to "promulgate and issue reasonable rules and regulations as deemed necessary for the administration of this Act." ¶ 505. Pursuant to this authority, the Comptroller has promulgated regulations now codified at 80 Ill.Admin.Code §§ 2500.-10–2500.70 (1991). In addition, the Illinois Department of Central Management Services has promulgated regulations relating to the program at 80 Ill. Admin. Code §§ 2650.1–2650.30 (1991).

### B. *The Plaintiffs*

Pilsen Neighbors is a tax-exempt, non-profit corporation organized for the benefit of a large Mexican–American community in Chicago's Pilsen neighborhood. Its activities include leadership training, coordination of several social service delivery agencies, support of various schools and educational programs in the Pilsen community, development of economic plans in the community, and assistance in the areas of naturalization and voter registration. Pilsen Neighbors applied to the Comptroller for access to the United Fund program on June 23, 1980. The application was denied on June 30, 1980, and Pilsen Neighbors has not reapplied for United Fund status and has not attempted to become a Qualified Organization under the VPDA.

NCF, also a tax-exempt, non-profit corporation, is organized to provide research, education and funding to consumer and citizen organizations. One organization it assists is the Illinois Public Action Council, a federation of over 75 organizations including senior citizen groups, homeowners associations, church groups, tenants groups, taxpayer organizations, labor unions, community organizations, and health and energy coalitions. Another organization that NCF supports is Metro Seniors in Action, a federation of 23 senior citizen organizations in the City of Chicago. Like Pilsen Neighbors, NCF applied for and was denied access to the Illinois charitable payroll deduction program in 1980, and has taken no further actions to become part of the program as revised in 1983.

In their 1980 letters to the Illinois Comptroller, neither Pilsen Neighbors nor NCF asserted that they were a United Fund, or that they were the organization running the single, annual, consolidated charity drive in their community, or that they served in place of a United Fund in their community.

### C. *The State Employees Combined Appeal*

Illinois sponsors an annual drive known as the State Employees Combined Appeal ("SECA") designed to encourage its employees to participate in the charitable payroll deduction program. The SECA drive is governed by rules at 80 Ill.Admin.Code §§ 2650.1–2650.30. Under Section 2650.15, the SECA drive commences the second Tuesday after Labor Day and can last no longer than eight weeks. Each participating organization must be accorded equal access and promotional opportunity time, but may not disrupt the workplace. Section 2650.15 also mandates the preparation of one combined brochure and payroll deduction form that describes all qualifying charities. The brochure is to be distributed to all employees. The 1990 brochure describes in some detail eight charitable organizations eligible for payroll deductions: International Services Agencies; Veterans Protective League; Illinois Women's Funding Federation; Black United Fund of Illinois, Inc.; Little City Foundation for Retarded Children; United Negro College Fund; Combined Health Appeal (ICVHA); and United Way.

Section 2650.10 sets up a support committee to implement SECA under the aegis of the Director of the Governor's Office of

Voluntary Action. The members of the committee include representatives of various state agencies and employee groups as well as one representative from each participating charitable organization. The duties of the committee include planning for SECA, reviewing campaign materials, selecting SECA chairpersons and coordinators, and verifying continued eligibility of participating organizations in conjunction with the Comptroller's Office. SECA coordinators are state employees who are allowed to distribute literature, collect pledge cards, and work with representatives of participating organizations during working hours. Liaisons are state employees who assist SECA coordinators. Under Section 2650.10(c), employees may attend presentations by participating organizations in the workplace as long as no employee spends more than an hour each year in the aggregate at such presentations.

## D. *United Funds/United Ways*

Under the Act, the Comptroller must determine annually which organizations qualify as United Funds. In practice, the Comptroller relies to a significant extent on a directory prepared by the United Way of Sangamon County ("UW/Sangamon"). The Comptroller insists that she retains the final decision as to who qualifies as a United Fund, and that a review process was instituted in 1988 for UW/Sangamon's directories. Defendant admits, however, that she has never rejected an organization on, or added an organization to, the list supplied by UW/Sangamon.

The parties at various times treat the terms United Fund and United Way interchangeably. United Way, however, is a registered trademark and presumably cannot be used by a fundraising organization without permission from the trademark owner. The 1990 SECA brochure lists 241 United Funds eligible for employee deduction; many bear the United Way name, but

a significant minority are called Community Chests, United Funds, or another name. For promotional purposes, all the United Funds are lumped under the United Way banner (which might explain the parties' mixing of the two terms). The brochure contains a two-page description of United Way describing the organization in general terms.[4] The United Way description also refers to the 241 "United Ways" that are separately listed.

The status of "United Funds" and "United Ways" is confused not only by the SECA brochure but also by the network of United Ways that operates in Illinois. Starting at the top: The United Way of Illinois is an organization that lobbies for and provides management and administrative advice for various United Ways across the state. Its members include local groups with "United Way" in their name as well as "United Funds"—i.e., Community Chests and other groups that perform similar fundraising services in their community.

The United Way network is most confusing in the Chicago area. United Way/Crusade of Mercy acts as a "super-umbrella" organization whose central duty apparently is to coordinate fundraising efforts for all Chicago-area United Ways. It counts only two United Way organizations as official members, however—United Way of Chicago and United Way of Suburban Chicago. United Way of Chicago is apparently like a normal United Fund (but much bigger) in that it distributes money to its member human service agencies. On the other hand, United Way of Suburban Chicago's member agencies are not direct-service providers, but rather are other United Ways and United Funds located in the Chicago suburbs.

When a state employee chooses the "United Way option" in the SECA campaign, he may choose the specific United Fund from a list of 241 organizations.[5] If

---

4. The brochure also contains a two-page description for each Qualifying Organization.

5. An employee may also pick the generic code for United Way, in which case the employee's

deductions will automatically be funnelled to the United Fund in the employee's hometown.

United Way/Crusade of Mercy and United Way of Suburban Chicago are not included in the list of 241 United Funds. Only Funds that

the Fund chosen is in the Chicago area, the money is transferred first to United Way/Crusade of Mercy. If United Way of Chicago is chosen, it receives the money directly from Crusade of Mercy. If a suburban United Way is chosen, the money is transferred from Crusade of Mercy to the United Way of Suburban Chicago and then to the designated United Way. If the fund chosen is outside the Chicago area, UW/Sangamon serves as the remitting agent and transfers the money to the designated Fund.

In 1989, Illinois state employees donated over one million dollars to United Way agencies through the SECA campaign.

## II.

### A. *Void-for-Vagueness Challenge*

■■■ Plaintiffs claim that the Act is unconstitutionally vague in its definition of United Funds—the organizations that automatically qualify for the payroll deduction program under Paragraph 503(c).[6] It is well settled that a statute may not give unfettered discretion to executive officials to decide who may or may not exercise protected speech. *Black United Fund, Inc. v. Kean*, 593 F.Supp. 1567, 1579 (D.N.J.1984), reversed on grounds of mootness, 763 F.2d 156 (3d Cir.1985) (*"BUF/NJ"*). In *BUF/NJ*, the court concluded that a statute allowing only "United Funds" access to a state employee charitable drive was unconstitutionally vague. The statute in *BUF/NJ* did not define United Fund in any way.

Our case is different than *BUF/NJ*, however, because Illinois has defined a United Fund. The characteristics of a United Fund are defined with some specificity: it is an umbrella organization that conducts the single, annual, consolidated fundraising effort in a community. Judge Moran noted that these are "fairly clear terms." 672 F.Supp. at 302. Indeed, plaintiffs' argument is hard to reconcile with the gist of

their complaint: "For all practical purposes, the term 'United Fund' is synonymous with 'United Way'." Appellants' Br. at 4. Indeed, as Judge Moran concluded in 1987:

> It is this court's understanding that the United Fund concept is well understood throughout the state. Through a process of time and local interaction umbrella groups have been devised to carry forward single coordinated fund drives. Those drives are aimed primarily toward private giving unrelated to government. They solicit individuals directly and through the private workplace. The state campaign is important primarily in those localities having substantial state government employment, and the state's role is substantially similar to that of a private employer who chooses to play the part of a "good citizen employer" by facilitating the private giving of its employees for charitable purposes. The identity of the United Fund in an area is well known to those in the area, although its scope and configuration may well differ markedly from a United Fund in another area with differing needs and problems.

672 F.Supp. at 303. Judge Leinenweber agreed with Judge Moran that the definition of United Fund was well understood.

■■ Plaintiffs also argue that the term "community" as used in the Act is vague. Our examination of the context in which the term is used in the Act, and the way in which the term has been interpreted by the Comptroller, causes us to disagree. The term "community" is part of the definition of a United Fund, an organization commonly understood to cover a specific geographical area such as a county or city that is easily recognizable by its residents. We do not think the term could be interpreted broadly, as plaintiffs imply, to include a "community of consumers" served by NCF.

directly distribute monies to human service agencies are included.

**6.** We agree with Judge Moran that plaintiffs have standing to bring this claim because they

have "alleged such a personal stake in the outcome of the controversy." 672 F.Supp. at 307, quoting *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

Plaintiffs argue, if only briefly, that the term "community" is not clarified by defendant's administration of the VPDA and that multiple United Ways operate in the Chicago and surrounding suburban area. Plaintiffs' points are to a certain extent well taken; we are somewhat troubled by the current handling of Chicago-area United Funds in the SECA drive. After careful consideration, however, we conclude that plaintiffs were not injured by defendant's administration of the Act, and further that the notion of community is not made unconstitutionally vague by this administration of the Act.

Although plaintiffs do not refer to it when making their vagueness argument, the core of the problem is the apparent assumption on the defendant's part that the United Way/Crusade of Mercy is *the* United Fund for the entire Chicago and suburban area. The deposition of the Comptroller's legal counsel makes this clear. Plaintiffs were rejected in 1980 because they were not United Funds. The fact that United Way/Crusade of Mercy already performed a single, annual, consolidated drive in the Chicago area seemed to play a large part in this decision. It is clear that neither plaintiff could meet the definition of United Fund under the statute. Neither Pilsen Neighbors nor NCF claimed to be a United Fund in their 1980 letters to the Comptroller. Nor could they. Pilsen Neighbors does not disburse funds to member agencies. NCF does not limit its fundraising to a particular community.

We note that the division of duties between the various United Ways in the Chicago area makes it hard for any single organization in that region to fit neatly into the VPDA's definition of United Fund. The United Way/Crusade of Mercy seems to coordinate the United Way drive in the Chicago Metropolitan area, but it also seems clear that the local (suburban) United Ways engage in some fundraising as well. Thus, neither the Crusade of Mercy nor local United Ways perform *the* single, annual, consolidated fundraising drive in their community. Crusade of Mercy seems closest to fulfilling this requirement, but the Comptroller lists the various suburban

United Ways in the 1990 brochure—and does not list the Crusade of Mercy at all. In the final analysis, however, the Comptroller's practice is probably justified by the close association between the Crusade of Mercy and the local United Ways; as a practical matter, they could be considered affiliates.

In the ethnically rich and community-oriented city of Chicago, however, it seems plausible that an organization could become the United Fund for a particular community by performing a consolidated fundraising drive in that community, yet remain unaffiliated with the Crusade of Mercy. Nothing in the statute suggests that a community must correspond to a legal political entity; indeed, several United Funds cover multiple suburbs or vague areas such as Southwest Cook County. In addition to the geographical overlap between the Crusade of Mercy and the Chicago and suburban United Ways, there is also precedent for a United Fund that serves a community wholly within another community served by another United Fund—in Bureau County, there is a county-wide United Way, but there are also separate community funds for the towns of Sheffield and Walnut. To deny United Fund status to an organization in the Chicago area that met the definition of the United Fund, simply because the Crusade of Mercy already existed, would violate the Constitution.

Nevertheless, such an injury has not occurred here. Plaintiffs simply do not meet the definition of United Fund, even when it is stretched to allow multiple fundraising in a single community. The fact that United Way in the Chicago area is divided, no doubt out of necessity, into various functional units does not make the notion of community under the VPDA vague.

Plaintiffs also assert that Illinois' delegation to UW/Sangamon of the duty to compile the initial list of United Funds under the Act shows the standardless nature of the statutory definition of United Fund. Plaintiffs do not contend that this is an

unconstitutional delegation of power, but rather maintain that neither UW/Sangamon nor the Comptroller makes any effort to ensure that the entries on the list meet the statutory requirements of the Act. But plaintiffs point to no organization on the list that does not meet the Act's requirements. And, as defendant notes, no group has complained about being mistakenly left off or placed on the list compiled by UW/Sangamon.

For the reasons given above, plaintiffs' void-for-vagueness challenge against the Act fails.

## B. *First Amendment Challenge*

■ The Supreme Court has made it clear that charities have a First Amendment right to solicit charitable contributions. *United States v. Kokinda,* 497 U.S. 720, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990); *Riley v. Nat'l Fed'n of the Blind, Inc.,* 487 U.S. 781, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988); *Secretary of State of Maryland v. Joseph H. Munson Co.,* 467 U.S. 947, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984); *Village of Schaumburg v. Citizens for Better Environment,* 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980). In *Riley,* the Court struck down a North Carolina law requiring charitable fundraisers to disclose, whenever they solicited funds, the percentage of the funds they had raised over the past year that was actually distributed to charities. 487 U.S. at 798, 108 S.Ct. at 2678. The Court reasoned that the law mandated certain speech and therefore was subject to the same First Amendment scrutiny that would be required if it restrained speech. *Id.* at 796–797, 108 S.Ct. at 2677–2678. Solicitation of funds was considered to be "inextricably intertwined" with the charity's communicative message. *Id.* at 796, 108 S.Ct. at 2677. Because the North Carolina law discriminated unfairly against newer charities that legitimately may have higher overhead costs, and because antifraud statutes adequately protected victims of unscrupulous activities, the Court con-

cluded that the law was unconstitutional since it was not narrowly tailored to meet a compelling governmental interest. *Id.* at 798, 108 S.Ct. at 2678. The Supreme Court used similar reasoning when it struck down a village ordinance allowing solicitation only by charities with less than 25% overhead and fundraising costs, and a state law forbidding contracts between charities and fundraisers if the fundraiser charged a fee of more than 25% of the money collected. See *Village of Schaumburg; J.H. Munson Co.* However, most recently, a plurality of the Supreme Court in *Kokinda* upheld a law barring solicitation on a post office sidewalk that was government property as a reasonable limitation on free speech in a non-public forum.

Relying in large part on *Riley* and *Village of Schaumburg,* plaintiffs contend that the VPDA violates their First Amendment rights in a variety of ways. The requirements listed in Section 503(b), it is asserted, unreasonably restrict the plaintiffs' right to solicit charitable contributions. Plaintiffs specifically challenge the requirement under Section 503(b)(6) that mandates disclosure of their fundraising and overhead costs. In addition, plaintiffs allege that the Act violates their associational rights by coercing them to become member agencies of United Way. Underlying these claims is the parties' disagreement over whether Illinois has created a limited public forum in this case, or whether, as the district court concluded, the state employee charitable solicitation drive impacts only a nonpublic forum.[7] Because of the importance of this question, we address it first.

## 1. Public or Non–Public Forum

The Supreme Court's decision in *Cornelius v. NAACP Legal Defense & Educational Fund, Inc.,* 473 U.S. 788, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985), provides the starting point for analyzing the public forum issue in this case. The plaintiffs in *Cornelius,*

---

7. The Supreme Court in *Perry Education Association v. Perry Local Educators' Association,* 460 U.S. 37, 45–46, 103 S.Ct. 948, 954–955, 74 L.Ed.2d 794 (1983), divided forums for the pur-

pose of First Amendment analysis into three types: traditional public forums, limited public forums, and non-public forums.

legal defense and political advocacy organizations, challenged the constitutionality of the Combined Federal Campaign ("CFC"), the federal analogue to the state charitable program at issue here. Rules governing the CFC (which was set up pursuant to an Executive Order) did not allow the *Cornelius* plaintiffs to participate in the campaign because they engaged in litigation or lobbying in order to advance the causes of their constituents.

In *Cornelius*, the Supreme Court ruled against plaintiffs on their First Amendment claims. After concluding that the charitable solicitations in the federal workplace (consisting largely of a 30–word statement in a campaign brochure) were protected speech, the Court considered whether this speech occurred in a public forum. The CFC was clearly not a traditional public forum like a public park or street, so the question before the Court was whether the government had created a limited public forum under the CFC.

When a non-public forum is at issue, the statute or regulation being challenged need only be reasonable and viewpoint neutral. *Id.* at 800, 105 S.Ct. at 3448, citing *Perry,* 460 U.S. at 45, 103 S.Ct. at 954. When a public forum is involved, however, stricter scrutiny is required. Because ideas are traditionally freely exchanged in a public forum, any law restricting access to the forum must be narrowly tailored to meet a compelling governmental interest. *Id.*

The Court concluded that the government had not created a limited public forum. Neither government practice nor government policy revealed an intent on the government's part to designate the CFC as a public forum open to all tax-exempt organizations (only 237 charities out of 850,000 nationwide participated in the CFC in 1981). *Id.* at 804,·105 S.Ct. at 3450. The Court also noted that the federal workplace, like any place of employment, exists to accomplish the business of the employer. *Id.* at 805, 105 S.Ct. at 3450. Furthermore, "nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." *Id.* at 799–800, 105 S.Ct. at 3447–3448.

Judge Moran held that Illinois, like the federal government in *Cornelius*, had created a non-public forum under the VPDA (Judge Leinenweber adopted this holding as the "law of the case"). Although plaintiffs contend that the VPDA is unconstitutional even if it is considered to create a non-public forum, they assert that the forum determination below was erroneous. We disagree. Plaintiffs argue that the forum created by the VPDA is "far different" from the CFC forum because of the opportunity for minimal face-to-face presentations (no employee may spend more than one hour each year at such presentations), the involvement of coordinators and liaisons in publicizing the campaign, and the alleged lack of criteria for the majority of participants. On the contrary, we agree with Judge Moran that any distinctions between the CFC forum and the forum created by the Illinois Act are insubstantial:

> First, the same sort of face-to-face solicitation of federal employees seemed to be present in the CFC. *See Cornelius,* 473 U.S. at 810 [105 S.Ct. at 3453] * * *. Second, there is no indication that the Illinois legislature intended to open up state workplaces as fora available to any charitable organization * * *. Third, the fact that the Illinois statute allows only umbrella or qualified organizations to participate in the campaign provides a strong inference that the state did not intend the campaign to be open to all registered charitable institutions.

672 F.Supp. at 304–305.

Because the solicitation of Illinois employees occurs in a non-public forum, we evaluate whether the restrictions imposed by the VPDA on Qualified Organizations are reasonable and viewpoint neutral. It must be decided whether the procedures employed by the VPDA are reasonably related to legitimate state goals. Plaintiffs

challenge various sections of the VPDA in isolation as unreasonable; reasonableness depends, however, upon an examination of each provision in the proper context of the entire Act.[8] It is with this admonition in mind that we turn to plaintiffs' specific challenges.

### 2. Reasonableness of the Disclosure Requirements

 Plaintiffs argue that the requirement under Section 503(b)(6) that Qualified Organizations disclose, on all petitions and payroll deduction cards, the percentage of their receipts which is expended for fundraising and overhead costs is unreasonable. The unreasonableness of this requirement, plaintiffs contend, is apparent after the Supreme Court's decision in *Riley* that invalidated a law requiring professional fundraisers to disclose to potential donors the percentage of funds collected during the prior year that was actually turned over to charities. Plaintiffs state that the similar restriction in the VPDA must be reviewed with "exacting scrutiny," *Riley*, 487 U.S. at 798, 108 S.Ct. at 2678, and that the disclosure requirement must be narrowly tailored to the state's goal.

It is apparent that plaintiffs want us to apply a strict scrutiny test to the disclosure requirements in the VPDA, regardless of the nature of the forum involved. *Riley*, however, does not compel or even suggest such a result. The statute struck down in *Riley* applied to all solicitation in all forums, whether public or non-public. The fact that the Supreme Court did not discuss the forum issue (because obviously public forums were implicated) does not make the ruling apply automatically to all forums. The disclosure requirements of the VPDA apply only to a nonpublic forum—the limited state employee solicitation of charitable funds. These disclosure requirements need only be reasonably related to a legitimate state goal, not narrowly tailored to meet a compelling state interest. The Court in *Riley* noted that the state interest

in disclosure was legitimate—"we do not wish to denigrate the State's interest in full disclosure." 487 U.S. at 798, 108 S.Ct. at 2678; see also *Village of Schaumburg*, 444 U.S. at 637, 100 S.Ct. at 836 (noting legitimate state interest in preventing fraud in the context of charitable solicitations). The disclosure of a charity's overhead and fundraising expenses is certainly reasonably related to this goal. Cf. *United Black Community Fund, Inc. v. City of St. Louis*, 800 F.2d 758 (8th Cir.1986) (city's decision to limit access to its payroll deduction program to charities whose administrative and fundraising costs do not exceed 25% of contributions is reasonable).

### 3. Reasonableness of Other Restrictions on Qualified Organizations

 Plaintiffs also challenge as unreasonable and not related to any legitimate state goal the other hurdles that organizations must overcome before becoming participants in the state employee charitable campaign. Particularly unreasonable, according to the plaintiffs, are the 4000–signature requirement and the limitations on the types of organizations to which Qualified Organizations may distribute funds.

The articulated purposes of the VPDA can be summarized as follows: 1) to help meet the needs of human health and welfare, 2) to provide a convenient channel for state employees to contribute to charities with a minimum of disruption to the state workplace, and 3) to ensure that recipient charities use the monies raised responsibly. ¶ 502. The last purpose was discussed in the prior section of this opinion. Plaintiffs do not dispute that the first two purposes evince legitimate government interests. They argue, however, that two additional governmental interests identified by Judge Leinenweber—ensuring that a charity is popular with state employees, and restricting the number of groups that solicit—are illegitimate.

Initially, we note that restricting the number of groups that solicit is not so

---

**8.** Any argument that certain provisions are unreasonable because they apply only to qualified organizations and not to United Funds will be deferred to the Equal Protection discussion, *infra.*

much a "purpose" of the VPDA but rather is a way to minimize the disruption to, and enhance the convenience of, state employees. Plaintiffs contend that adding more charities will only minimally disrupt the program because it would only require adding more computer codes from which employees can select. But adding more charities will undoubtedly increase printing and other administrative costs. In addition, the state is entitled to consider the convenience to its employees in being able to select from a relatively few charities, with a large amount of information available for each charity, as opposed to a large number of charities, with only minimal information concerning each charity.

As an original matter, a legislative purpose to include only "popular" charities in the state workplace charity drive would seem antithetical to the First Amendment. This, of course, is not a stated purpose of the VPDA, but can be inferred from the 4000–signature requirement in the Act. The Supreme Court, however, has held that the government may be legitimately concerned that the inclusion of unpopular charities might hinder acceptance of the charitable program:

> Although the avoidance of controversy is not a valid ground for restricting speech in a public forum, a nonpublic forum by definition is not dedicated to general debate or the free exchange of ideas. The First Amendment does not forbid a viewpoint-neutral exclusion of speakers who would disrupt a nonpublic forum and hinder its effectiveness for its intended purposes.

*Cornelius,* 473 U.S. at 810–811, 105 S.Ct. at 3453–3454. The 4000–signature requirement is also a neutral way of limiting the number of charities in the state employee workplace drive. Although obtaining 4000 signatures is no doubt a significant burden, at least seven organizations have been able to meet this requirement (and the other requirements under the VPDA) and are now Qualified Organizations. We therefore conclude that the restrictions in Paragraph 503(b) are reasonably related to legitimate government interests.

### 4. Plaintiffs' Associational Rights

▪ Relying on political patronage and other right to association cases, *e.g., Rutan v. Republican Party of Illinois,* 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990), plaintiffs argue that forcing them to affiliate with a United Fund violates their constitutional rights. It is unquestioned that the charities who participate in the SECA drive garner a benefit—quick and easy access to a large group of potential donors (who can later say, "I gave at the office"). Plaintiffs assert that this benefit cannot be conditioned "in a way that penalizes the exercise of the rights to free belief and association." Appellants' Br. at 23, citing *Grossart v. Dinaso,* 758 F.2d 1221, 1225 (7th Cir.1985).

Plaintiffs' associational argument is no more than a recasting of their free speech argument. Any organization that is denied access to a forum while a different organization is allowed in the forum could complain of being coerced to join the organization allowed in the forum. The plaintiffs in *Cornelius* certainly could have cast their argument in these terms. The gist of plaintiffs' complaint remains, however, that their free speech rights were denied when they were denied access to the state charitable deduction program. In addition, the idea that plaintiffs are forced to join United Ways ignores the alternative method of gaining access to the forum—qualifying under Paragraph 503(b). We determined above that this Qualifying Organization provision was reasonable. Therefore plaintiffs' associational argument fails.

### C. *Equal Protection and Viewpoint Neutrality*

▪ The VPDA would violate the First Amendment if not viewpoint neutral on its face or in its application. In addition, the VPDA would violate the Equal Protection clause if not viewpoint neutral, because it would then provide benefits to one class but not to others for an illegitimate reason. If the VPDA sets up a viewpoint neutral system, on the other hand, then we need only decide if the distinctions between United Funds and other charities are reason-

ably related to legitimate state interests. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 103 S.Ct. 948. Because of these considerations, our discussion of equal protection and viewpoint neutrality is combined in this section.

The VPDA is viewpoint neutral on its face. The preference given to United Funds is not due to any particular viewpoint that United Funds share but is rather due to the fact they perform single, annual, consolidated fundraising drives in their respective communities. In addition, the plaintiffs cannot complain that they were discriminated against because of their ideologies—they were denied access because they could not qualify as United Funds. As noted above, neither Pilsen Neighbors nor NCF claimed to be a United Fund in their 1980 letters to the Comptroller. Therefore plaintiffs were denied access into the program because of their status, not because of their views.[9] It is not proper for this Court to speculate whether organizations fitting the definition of a United Fund, but not willing to be affiliated with a United Way, would be discriminated against because of their viewpoint.

■ Since the VPDA is viewpoint neutral as applied in this case, we must next determine if the distinctions between United Funds and Qualified Organizations are reasonably related to a legitimate state interest. The defendant principally asserts that the distinctions are justified because it is convenient for the employee to contribute to United Funds—the employee can support a number of charitable organizations without being subject to numerous appeals from each organization. Defendant also cites the historical and widespread support for United Ways in Illinois. An employee's desire to donate to a consolidated drive that serves his own community, it is asserted, also supports the automatic inclusion of United Funds. We cannot say that these justifications are unreasonable, and therefore conclude that the

record in this case reveals no violation of plaintiffs' Equal Protection rights.

### III.

In summary, we hold that the VPDA, which creates a non-public forum in the State of Illinois workplace, does not violate the Constitution either on its face or as applied on the record before us to plaintiffs. Therefore, the judgment below is

AFFIRMED.

---

9. The Supreme Court concluded in analogous circumstances in *Perry Local Educators' Association* that a School Board policy granting the teachers' current union access to faculty mail-boxes but denying such access to a rival union was based on the status of the current union as the teachers' sole collective bargaining agent, rather than on the views of the unions.